**JULIEN J. STUDLEY, INC., Plaintiff,**

v.

**GULF OIL CORP., Defendant.**

No. 63 Civ. 231.

United States District Court
S. D. New York.
April 10, 1968.

Kramer, Bandler & Labaton, New York City, for plaintiff; by Alan E. Bandler, New York City, of counsel.

Carb, Luria, Glassner & Cook, New York City, for defendant; by William M. Kufeld, New York City, of counsel.

## OPINION

POLLACK, District Judge.

Gulf Oil Corp. leased space in the Sperry Rand Building in New York City for a ten year period with renewal options. It was represented in the negotiations for the lease by the brokerage firm of Cushman & Wakefield to whom the landlord has paid brokerage commissions.

The plaintiff in this case, a real estate brokerage firm, asserted that it was improperly deprived of a brokerage commission on the lease by the misconduct of Gulf Oil Corp. and brought suit against Gulf Oil Corp. for damages.

This case was submitted to a jury together with special questions and it rendered a verdict in favor of the plaintiff for $25,000. The defendant, Gulf Oil Corp. has moved to set the damage verdict aside and for judgment in its favor pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, and it has renewed motions for a directed verdict made during the trial on which decision was reserved. No judgment has as yet been entered.

The motions were argued orally and the Court thereupon carefully reviewed the trial transcript and the trial exhibits.

## 1. THE CLAIMS

The plaintiff's complaint asserted three separate claims against the defendant in connection with the lease which defendant entered into.

The first claim—for breach of contract—was that the defendant employed the plaintiff as its real estate agent to locate office space for it in New York City with the understanding that, if the plaintiff procured an acceptable lease for it, "defendant would enter into a lease * * * and * * * plaintiff would be the broker in the transaction", and thereby become eligible for payment of a commission by the owner of the property or the landlord.

The plaintiff alleged that the contract with it was made by one Burkhiser, the director of defendant's department of General Services stationed in Pittsburgh, Pennsylvania.

The plaintiff further contended that if Burkhiser was not authorized either actually or apparently to commit the defendant to the alleged agreement made on its behalf, the defendant had ratified the agreement by accepting the services of the plaintiff with full knowledge of the alleged agreement.

The plaintiff contended that the defendant breached the agreement by failing to act in good faith and by failing to designate the plaintiff as broker upon entering into a lease with the landlord, Rock-Uris and by failing to advise Rock-Uris of the plaintiff's role in the transaction resulting in a lease of space in the Sperry Rand Building. The plaintiff claimed that it would have received a commission from Rock-Uris, but for Gulf's breach and sought as damages the amount of the compensation it would have earned.

The second claim alleging malicious interference by the defendant with a reasonable expectancy of economic gain and with the plaintiff's business relationship with Rock-Uris, the landlord, and the third claim, alleging a conspiracy, were rejected by the jury and therefore need not be considered on this motion by defendant.

## 2. THE VERDICT

With respect to the first claim the case was submitted to the jury on the following special questions:

1. "Did Gulf authorize Burkhiser to enter into an agreement with Studley binding it to represent to Rock-Uris that Studley was responsible for the lease to Gulf in the Sperry Rand Building?"

The jury's answer to this first question was "No".

2. *"Did Gulf ratify with knowledge thereof any arrangements made by Burkhiser with Studley pertaining to the lease to Gulf in the Sperry Rand Building?"*

3. "Did Gulf breach any agreement with Studley made with Gulf's authority or ratified by it with knowledge thereof?"

The jury answered each of the second and third questions "Yes".

6. "To what award, if any, is plaintiff entitled from Gulf?"

The jury's answer to the sixth question was "$25,000."

The defendant contends that there is no evidence whatsoever in the record of a ratification of the unauthorized arrangement made by Burkhiser.

### 3. THE LEGAL STANDARD

Disposition of the defendant's motion to set aside the verdict and to enter judgment of dismissal notwithstanding the verdict is governed by the same standard as governs a motion for a directed verdict. The motion may be granted only if there is a total absence of evidence to support a verdict, or if without weighing the credibility of the evidence there can be but one reasonable conclusion as to the proper judgment. Fleet Messenger Service, Inc. v. Life Insurance Company of North America, 315 F.2d 593 (2d Cir. 1963), 5 Moore's Federal Practice, ¶ 50.07, p. 2356. If there was evidence it must be viewed in a light most favorable to the plaintiff. Cf. O'Connor v. Pennsylvania R.R., 308 F.2d 911 (2d Cir. 1962).

In the instant case if the defendant did not ratify the unauthorized contract sued upon, the plaintiff would not be entitled to damages for the breach thereof. The question presented therefore is whether there was evidence from which the jury could reasonably conclude that the defendant ratified the contract.

### 4. THE BACKGROUND FACTS

Consideration of the question raised is aided by a brief review of the facts including the scope and nature of the services rendered by Studley.

In September, 1962 Gulf Oil Corp. was seeking office space in New York City. In response to a request by Burkhiser, Studley furnished Burkhiser with a list of buildings in the Rockefeller Center area in which there was space for rent; the list gave the rentals being requested. The data identified buildings that were completed or in the process of construction and nearing completion. One of the buildings included in Studley's list was the Sperry Rand Building at 1290 Avenue of the Americas, which was nearing completion.

The data supplied by Studley was essentially the information circulated publicly by renting agents of the buildings involved. None of the data involved any special or confidential information; it was all of the type which building owners and their renting agents circulate generally to lists of brokers and to business organizations generally or to those known to be interested in leasing commercial space. In addition to furnishing such a list Studley walked with Burkhiser to inspect the Pan American Building at 200 Park Avenue which was then completed and walked to the site of the Sperry Rand Building which was still in process of construction. There also were telephone calls between Studley and Burkhiser which kept the contact alive during the ensuing weeks.

Unknown to Burkhiser, a senior officer of the defendant stationed in its New York Office, one Cadman, had independently been negotiating for space through another broker, Cushman & Wakefield. The existing lease which the defendant had on space in Canada House was about to terminate; either it had to be renewed by October 31, 1962 or other space procured. Cushman & Wakefield were the renting agents for Canada House and were also the renting agents for the Sperry Rand Building. Although the emphasis was on attempting to work out a renewal of the space arrangement at Canada House, according to defendant, Cushman & Wakefield had, prior to Burkhiser's contacts with Studley, already called to the attention of Mr. Cadman the Sperry Rand Building and the possibilities of acquiring space therein for the defendant.

The defendant's determination to move its quarters crystallized at a meeting of Gulf Oil executives in Florida during the week of October 22, 1962. Shortly before that date or during that week Mr. Cadman notified Cushman & Wakefield that it desired to proceed actively with the consideration of space in the Sperry Rand Building.

At about the same time, Burkhiser, having been informed of Cushman &

Wakefield's presence in the matter, wrote a memorandum to Cadman mentioning that Studley had exposed him to the Sperry Rand Building. Burkhiser stated therein that Studley had performed services for Gulf, and might be entitled to some consideration. No mention was made of any agreement between Burkhiser and Studley.

Thereafter, on October 30, 1962, a meeting was called in Mr. Cadman's office in New York attended by a representative of Cushman & Wakefield and by the technical staff of the defendant whose function it was to plan the specifications and layout and furnishing of space rented by the defendant. Included in the latter group was Burkhiser, who as the director of General Services Administration, was concerned with such problems.

It was at this meeting of October 30, 1962 that Burkhiser made the first disclosure to Cadman of his arrangements with Studley which the jury has stamped as forming an unauthorized contract. This disclosure led to an inquiry by Mr. Cadman addressed to Juncker of Cushman & Wakefield as to the position of Studley in the situation and according to Juncker, Cadman was told that in their opinion Gulf was free to select any broker it chose. On this, there is a conflict of testimony. Cadman said that Juncker said "You don't have to worry about Studley". For the purpose of determining the issue of ratification, this difference is immaterial.

Mr. Cadman then told Burkhiser that he agreed to go along with Cushman & Wakefield because he believed that Gulf was exposed first by Cushman & Wakefield to the Sperry Rand Building.

On November 7, Burkhiser phoned Studley to say that a problem had arisen; that there had been a mixup and that Gulf was going to make the deal through another broker. He requested Studley to be nice enough to step aside and indicated that he would endeavor to have Gulf do something nice for Studley some other time. Studley said he would think about it. He later called Burkhiser and said that he wanted Burkhiser to report the nature of the services that Studley had performed to his senior officers and that the time for the defendant to be nice to Studley was "now."

No act or statement of the defendant or any authorized person on its behalf thereafter gives any indication that the defendant adopted or made use of any of the services rendered by Studley or recognized or intended to recognize or adopt the unauthorized arrangements as obligations of the defendant. Due to the generality of the services it cannot be said realistically that Gulf *thereafter* utilized Studley's services or reports, or derived benefits therefrom.

In the ensuing weeks, Studley did not attempt to or speak with any authorized officer of Gulf and Gulf gave no indication to Studley of any intention or willingness to adopt its services or any obligation for its services or any obligation to request the landlord to consider or recognize Studley as the representative of Gulf in the matter of the lease of space in the Sperry Rand Building.

The plaintiff has failed to point to any evidence of ratification on which to impose an obligation on Gulf herein. On summation, plaintiff's counsel touched briefly on the doctrine of ratification and its applicability herein and he also submitted requests to charge thereon. This being a retrial of a case, it was deemed prudent to place before the Jury a special question on the subject of ratification for the guidance of any further proceedings to be had herein.

## 5. THE CHARGE TO THE JURY

The Court, without exception, charged the jury with respect to the factual elements necessary to sustain a claim of ratification, as follows:

"Ratification is a form of subsequent authorization and is based upon the principle of approval with knowledge of the facts to be ratified. If a principal with such knowledge that there is an agreement outstanding and with

knowledge of what that agreement is then accepts the benefits of an agent's action, the principal is responsible for agreement of the agent whether originally authorized or not."

This explanation was amplified in response to a question from the jury, again without exception, by the following:

" * * * ratification is the affirmance by a principal of a prior act or commitment which does not bind him but which was done or professedly done on his account, and the ratification occurs when the principal learns of the commitment and then affirmatively elects to adopt it as if originally authorized by him."

## 6. THE ELEMENTS OF RATIFICATION

Thus, ratification exists upon the concurrence of three elements: (1) acceptance by the principal of the benefits of the agent's act (2) with full knowledge of the facts, and (3) circumstances or an affirmative election indicating an intention to adopt the unauthorized arrangement. King v. Mac-Kellar, 109 N.Y. 215, 16 N.E. 201 (1888), Smith v. Kidd, 68 N.Y. 130 (1877), 2 Williston on Contracts § 278 (3d Ed.). Merritt v. Bissell, 155 N.Y. 396, 50 N.E. 280 (1898).

The knowledge required of the principal must be full and complete. If the principal's knowledge of the facts is partial or imperfect he will not be held to have ratified the unauthorized act, and the proof of adequate knowledge should be reasonably clear and certain. Trustees, etc., of Town of Easthampton v. Bowman, 136 N.Y. 521, 526, 32 N.E. 987 (1893).

The affirmative election to adopt must be evidenced by either express or implied intention to adopt.

"A ratification of the unauthorized act of an agent or of a stranger who claims to act as such, if it exists, must be found in the intention of the principal, either express or implied. If that intention cannot be shown, no ratification can be held to have been established. * * * where one who has assumed to act as an agent for another has no authority to do so, but is a mere volunteer, a failure to disavow his acts will not amount to a ratification, unless under such circumstances as indicate an intention to do so."

Merritt v. Bissell, 155 N.Y. 396 at pp. 409–410, 50 N.E. 280 at p. 282 (1898).

See also, Ramsay v. Miller, 202 N.Y. 72, 95 N.E. 35 (1911), Lilienthal v. German American Brewing Co., 121 App. Div. 628, 106 N.Y.S. 402 (1st Dept. 1907).

An intent to ratify is often implied from knowledge of the principal coupled with failure to timely repudiate, where the party seeking a finding of ratification has in some way relied upon the principal's silence or where the effect of the contract depends upon future events. In Lilienthal, supra, the Court held that a jury could have found that a modification made by plaintiffs' salesman of a contract for the sale of hops was ratified. The modification permitted the defendant purchaser to take hops at a future date at market. The market price dropped, but plaintiff sued for the original contract price, claiming that the salesman had no authority to modify the contract. The Court said that ratification could be implied from knowledge of the modification, coupled with the failure of the principal to repudiate.

Where equity so demands, the principal may be held estopped to deny ratification of a contract whether or not he in fact intended such ratification. For example, where a party commences performance under an unauthorized contract, and the principal with knowledge thereof fails timely to repudiate, the principal may be estopped.

The earliest occasion which presents any possibility of knowledge of the contract on the part of Gulf was the Oc-

tober 30 meeting between Cadman, Juncker and Burkhiser. At that meeting Cadman told Burkhiser, in no uncertain terms, that Juncker was the broker and that he should so advise Studley. Cadman expressed the opinion that Juncker was entitled to be recognized as Gulf's broker on the basis of having first exposed Gulf to the Sperry Rand Building. There was no evidence that Cadman either acknowledged Burkhiser's authority or adopted the alleged contract with Studley for Gulf. Indeed, it would be unreasonable for the triers of fact to find and conclude that Cadman at one and the same time intended to ratify the alleged contract for Gulf and yet sought to have the commission paid to another broker. Even if the jury chose to disbelieve the testimony of Cadman, Juncker and Burkhiser concerning this meeting, there was no affirmative evidence from which the jury could conclude facts contrary thereto.

On oral argument of the motion to set aside the verdict, the notion was advanced that Gulf was estopped to deny ratification by its failure to notify Studley that the latter's services and arrangement were unauthorized, so that Studley could take steps to assert its position to Rock-Uris. However, the evidence was that Rock-Uris was informed by Studley in written communications sent well in advance of the resolution by the parties to the lease of critical matters pertaining to the lease and well in advance of the agreement on and of the closing of the lease.

The other theory advanced to support a ratification by estoppel was that services were performed by Studley after Gulf received knowledge of Studley's alleged contract. There is no such evidence.

The final service which Studley supplied was on October 30, 1962, when Studley wrote to Burkhiser that Sperry Rand would begin to occupy the new building in May, 1963. Failure of Gulf to repudiate in time to forestall performance of that service by Studley cannot reasonably be termed untimely.

Studley could not reasonably have relied upon such failure. If there was confusion, it was the fault of Burkhiser, the unauthorized employee, who failed upon receiving Cadman's October 22nd communication that Cushman & Wakefield (Juncker) was the broker, to so advise Studley until November 7.

The services of Studley were substantially all received by Gulf prior to October 22, before it was aware that they had been supplied pursuant to an alleged contract with Burkhiser. When Gulf learned of the alleged contract, Studley's services were a *fait accompli* and Gulf was in no position to reject those services. Neither could Gulf at that time purge its records of information of data received nearly simultaneously or previously from Cushman & Wakefield, and to restore itself to a position of ignorance thereof.

At all events, Court's charge did not include any instruction on ratification by estoppel and there was no request from plaintiff that it should. Nor did plaintiff take any exception to this omission.

Plaintiff has advanced two theories to sustain the verdict on a theory of ratification by estoppel. However, the evidence does not sustain either of plaintiff's theories.

## 7. CONCLUSION

■ The evidence adequately supports the jury's finding on the first special question, that Burkhiser's arrangement with Studley lacked authority. However, there is no support for the finding of a ratification.

There is only one reasonable conclusion with respect to the question of ratification, which conclusion is reached without weighing the credibility of the evidence. There is a total absence of evidence on which to find ratification expressly or by implication, or of an intent to ratify, or of an election to adopt the unauthorized arrangement, or of a ratification by estoppel.

Plaintiff, having failed to establish the alleged contract, is not entitled to the award of damages.

The jury's findings of a ratification and a breach of a ratified but unauthorized contract and its damage verdict in plaintiff's favor are set aside; the defendant's motion for a directed verdict at the close of the evidence as well as on the answers to the remaining special questions are granted and judgment dismissing the complaint herein on the merits, with costs to defendant to be taxed shall be entered herein.

So ordered.