**GREAT NORTHERN INSURANCE COMPANY, Plaintiff,**

v.

**DAYCO CORPORATION, Defendant.**

**No. 83 Civ. 8102 (KTD).**

United States District Court,
S.D. New York.

Oct. 4, 1985.

---

Salon, Marrow, Dyckman & Trager, New York City, for plaintiff; Leslie Trager, of counsel.

Dickstein, Shapiro & Morin, New York City for defendant; Leonard Garment, Sidney Dickstein, Roslyn A. Mazer, R. Bruce Holcomb, Sheryl L. Sklorman, of counsel.

## MEMORANDUM & ORDER AMENDED

KEVIN THOMAS DUFFY, District Judge:

Plaintiff, Great Northern Insurance Company ("Great Northern"), commenced this action against defendant, Dayco Corporation ("Dayco"), seeking a declaratory judgment that it is not liable under the insurance policy issued to Dayco which provided "All Risk, Excess and Difference in Conditions Property Damage coverage on all real and personal property of the insured." Great Northern moves pursuant to Fed.R.Civ.P. 56 for summary judgment on the issue of coverage and for dismissal of defendant's counterclaim for $6,188,343.

Dayco moves for summary judgment on the seventh claim in Great Northern's complaint which alleges that Great Northern's liability, if any, is limited to $1,000,000 as Dayco's loss is a single, not multiple, loss. Finally, Dayco moves for an order striking certain portions of Great Northern's affidavit in support of its motion for summary judgment as well as Exhibits F, G, and H attached to the affidavit, for failure to comply with Fed.R.Civ.P. 56(e).

## FACTS

Dayco, a Michigan corporation with its principal place of business in Ohio, is engaged in the manufacture and sale of rubber and plastic belts and hose used in automobiles, trucks and tractors. Apparently, when the Soviet Union purchases non-domestic goods from companies such as Dayco, it does so through government purchasing agents called Foreign Trade Organizations ("FTOs") which then distribute the goods to various Soviet industries. *See* Dayco Exh. 55. (Affidavit of Richard O. Christian ¶ 4.). From 1976 through January of 1979, Dayco sold between $1 and $1.5 million worth of "V–Belts" per year to an FTO called Tractoroexport. *See id.*

During the spring and summer of 1979, Dayco began talking to Edith Reich about the possibility of having her companies, Foreign Transactions Corporation ("FTC") and Trachem Co. Ltd., become involved in the sale of Dayco products to the FTOs. In the fall of 1979, Reich made several trips to the Soviet Union. In November, Dayco was informed by Reich that another FTO, Raznoimport, had placed an order for Dayco's "Super Blue Ribbon V–Belts" totalling $1,656,680. *See* Dayco Exh. 26.

Under the arrangement between Dayco and FTC, FTC entered into agreements with the FTOs. Dayco would receive a letter from FTC stating that a particular contract had been procured and Dayco would manufacture the goods described in the letter. For such sales and prior to the delivery of the goods, FTC received a commission, ranging from 10 percent to 15 percent of the gross selling price.

During the years 1980 and 1981, FTC placed orders with Dayco totalling over $100 million and received commissions of approximately $14 million. In January of 1980, Reich confirmed to Dayco the receipt of a large contract for V-belts with Tractoroexport which, after amendment, totalled $11,087,255. *See* Dayco Exhs. 6 (Contract No. 61–09/0295 and addenda); 27 (letter confirming order). In June of 1980, Dayco received a second Tractoroexport contract for "SPC type V-belts" and other industrial belts totalling $2,027,860. *See* Dayco Exh. 29 (Contract No. 61–09/0509). Both orders were to be sent to Bremen, West Germany. In April of 1980, Reich confirmed to Dayco the procurement of six orders by Raznoimport for hydraulic hose totalling $17,088,- 555. *See* Dayco Exh. 28. In July of 1980, Reich wrote to Jeanette Curry of Dayco that Reich received two orders for automotive belts for another FTO, Avtopromimport, totalling $10,146,500. *See* Dayco Exh. 30. In September of 1980, Dayco received a letter from Reich acknowledging the receipt of two large orders by Tractoroexport and Raznoimport totalling $46,- 298,500 and $25,221,750, respectively. *See* Dayco Exhs. 9 (Contract No. 81–09/087981) & 32.

Between July 2, 1980 and September 15, 1980, Dayco received seven payments from Tractoroexport totalling $2,494,505. *See* Dayco Exh. 31. In the fall of 1980, Dayco began to express concern over the delays by the Soviets in picking up the goods in Bremen and in December of 1980, suspended the payment of commissions to FTC to prompt FTC to have the Soviets pick up the goods. In January, however, the payment of commissions resumed immediately followed by a pickup in Bremen. *See* Dayco Exhs. 13, 37.

In mid-February of 1981, Reich transmitted another order for Tractoroexport for $883,378 (Contract No. 61–09/1324) but Dayco and Reich had a dispute over the prepayment of commissions before other orders were picked up. Ultimately, on February 28, 1981, Dayco asserts, the second shipment was picked up. *See* Dayco's Rule

3(g) Statement ¶ 11(b). During May and June of 1981, Reich and Dayco officials corresponded about payments and pick-ups by the FTOs, and Reich's commissions. *See, e.g.,* Dayco Exhs. 40, 41, 42, 43, 44, 45, 46, 47.

By mid-July 1981, Dayco had received wire transfers of approximately $4.1 million. *See* Dayco Exh. 31. Dayco claims that by the end of July, it paid Reich all of the commissions due her on the Tractoroexport business as a result of Reich's threats not to provide the "trans" numbers necessary for shipment. Dayco asserts that by November of 1981 all twelve of the shipments to Bremen were picked up. *See infra* n. 4.

As a result of questions raised by Dayco's outside auditors, Ernst & Whinney, as to the accounting treatment of Dayco's sales to the Soviet Union, Dayco retained the law firm of Pisar & Huhs. In response to Pisar & Huhs' inquiry into the purported contracts procured by FTC, Tractoroexport and Raznoimport responded that they had no knowledge of the existence of many of the contracts. *See* Dayco Exhs. 53, 54.

On January 26–27, 1982, Dayco representatives met with Tractoroexport officials to discuss the status of certain contracts. Dayco was informed that only two contracts with Tractoroexport had been concluded through FTC, Contracts Nos. 61–09/0295 and 61–09/1324. Dayco's position is that all the remaining contracts claimed by Reich to exist were fictitious and that Contract No. 61–09/1324 was for $446,000 rather than $883,000.

In May 1982, Dayco brought an action for fraud and breach of contract against Reich and her companies in the Southern District of New York. *Dayco Corp. v. Foreign Transactions Corp., et al.,* 82 Civ. 3354 (S.D.N.Y.) (Lowe, J.) ("the Dayco/FTC action"). On October 12, 1984, a judgment for $19 million was entered against Reich and FTC. Dayco also filed twelve proofs of loss with Great Northern under an All Risks Policy issued to Dayco in 1976, and renewed each year including in 1981. *See*

Answer and Counterclaims, Exhs. A (Policy) 1–12 (Claims). The policy provided:

*Perils Insured Against* : This policy covers against All Risks of Direct Physical Loss or damage to property insured including general average and salvage charges except as hereinafter excluded.

Dayco's claims are premised on the argument that to the extent it did not receive full payment for the twelve shipments in 1981, the goods were lost and Dayco is entitled to reimbursement under the policy in the amount of $6,188,343. Paragraph 8 of Dayco's Counterclaims alleges that Dayco suffered its loss when Edith Reich caused Dayco to manufacture and ship goods to and from its warehouse in Bremen by representing that certain contracts existed which did not in fact exist. Dayco claims that "FTC and Reich wrongfully appropriated the Dayco goods to their own use...." Thereafter, Great Northern instituted this declaratory judgment action asserting that it was not liable on the policy and the instant motions followed.

### DISCUSSION

#### A. *Dayco's Motion to Strike*

Dayco moves to strike portions of the affidavit of Leslie Trager and Exhibits F, G, and H attached thereto submitted by Great Northern on the grounds that "significant portions of the [affidavit and exhibits] are inadmissible under Fed.R.Civ.P. 56(e) because they (1) contain inadmissible contentions, conclusions or opinions, (2) contain hearsay statements and/or (3) lack of a foundation for authenticity and admissibility...." Dayco's Memorandum In Support of Motion to Strike at 3.

To the extent that Trager, in his affidavit, states legal argument and conclusions, I will disregard it in ruling on the summary judgment motion; there is no necessity to formally strike those portions of the affidavit. Dayco also seeks the striking of Trager's references to the findings of John Huhs, the investigator, as constituting impermissible hearsay. Trager's statements about Huhs' findings are apparently drawn

from Huhs' deposition testimony. The fact that Trager has no personal knowledge of Huhs' findings is apparent and, as a practical matter, insignificant since Huhs' report and affidavit in the action before Judge Lowe have been submitted in connection with the instant motions. On hearsay grounds, Dayco objects to the court's consideration of Huhs' testimony to prove that certain contracts for Dayco goods existed, that Dayco's goods were delivered to Russia, that partial payment was made, and that additional quantities of goods, not called for in the existing contracts, were delivered to Russia. Dayco's objection is overruled.

Fed.R.Evid. 801(d)(2) provides that "[a] statement is not hearsay if [it] is offered against a party and is ... (B) a statement of which he has manifested his adoption or belief in its truth, or ... (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship...." Based on Dayco's own account of the events that transpired after Huhs' investigation, it is apparent that Dayco adopted Huhs' statements. Furthermore, it is obvious that Huhs was acting as an agent of Dayco's and that his statements were made within the scope of his agency and during his relationship with Dayco. Furthermore, there exist in the record various documents which provide adequate foundation for the assertions made by Trager as to Huhs' findings. I note also that the fact that the statements were made, as opposed to the truth of the contents of the statements, is relevant to the issue of what Dayco knew and when.

Dayco seeks also to have stricken Exhibits F, G, and H, purportedly Contract No. 61–09/1246 and addenda, Contract No. 61–09/2244, and Contract No. 61–09/1324, respectively. Apparently such contracts were produced during discovery in the Dayco/FTC action. Dayco objects to Great Northern's suggestion that Dayco has admitted in its answers to interrogatories that Exhibits F, G, and H represent valid contracts. Dayco asserts that its answer represented only its "current belief" and

that it, in fact, has no way of knowing whether such contracts are authentic or were fabricated by Reich. Defendant's position with respect to its answer is recognized but its motion to strike the exhibits is denied.

## B. *Great Northern's Summary Judgment Motion*

Great Northern seeks a judgment declaring that it is not liable to Dayco on the All-Risks insurance policy issued to Dayco on the grounds that:

1. The type of loss alleged by Dayco is not a direct physical loss and is therefore not covered under the policy.

2. Whatever loss occurred, occurred after the goods had ceased being Dayco's goods and thus were not covered by the policy.

3. As a matter of indisputable fact, the goods in question were not lost, but were sent to Russia and received by them.

4. Dayco has ratified the transactions in question.

Great Northern's Memorandum in Support of Motion for Summary Judgment, at 9.

On a motion for summary judgment, the movant must "show that there is no genuine issue as to any material fact and that [he] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The facts "must be viewed in the light most favorable to the opposing party." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

### 1. *Direct Physical Loss*

The policy provides that it "covers, to an amount for any loss at any location not exceeding $1,000,000 on all Real and Personal Property subject to all provisions of this policy including endorsements." *See* Plaintiff's Exh. C (Policy ¶ 1(a) ). Clause 8 of the policy provides that "[t]his policy covers against All Risks of *Direct Physical loss* or damage to property insured including general average and salvage charges...." *Id.* (emphasis supplied).

Great Northern attempts to limit its liability on the policy by arguing that because the policy covers "direct *physical* loss ... to property," and Dayco's loss was in the nature of a credit loss due to theft, Dayco's loss is not covered. Great Northern states, however, that if the policy provided coverage for "any loss to property" or "theft" the alleged loss would be covered. Citing *Katze v. Randolf & Scott Mutual Fire Insurance Co.*, 116 Wis.2d 206, 341 N.W.2d 689 (1984), plaintiff argues that the loss suffered by Dayco was the money it expected to receive from the sale of its products to Russia, not the actual products. *Katze,* however, is inapposite because *Katze* involved an insurance policy that specifically covered theft as opposed to "all risks."

Great Northern's argument totally ignores the nature and plain meaning of an "all risks" policy which creates "a special type of coverage extending to risks not usually covered under other insurance...." *C.H. Leavell & Co. v. Fireman's Fund Insurance Co.*, 372 F.2d 784, 787 (9th Cir.1967). "[R]ecovery under an 'all risk' policy will be allowed for all fortuitous losses not resulting from misconduct or fraud, *unless the policy contains a specific provision expressly excluding the loss from coverage." Id.* In an action on an all risk policy, the insured has the burden of proving the existence of the all risks policy and the loss of the covered property. *See Pan American World Airways, Inc. v. Aetna Casualty & Surety Co.*, 505 F.2d 989, 999 (2d Cir.1974). Because all risks coverage is procured to protect the insured against unexplained losses, once the insured shows that a loss occurred, to avoid liability, the insurer must show that the claimed loss is excluded from coverage. *See id.*

Great Northern's suggestion that loss due to theft is not embraced by the all risks policy is rejected. First, Dayco physically lost the goods in that it no longer has control over them and has received no compensation for them. Its loss is not merely a credit loss, which might, under the "phys-ical loss" language of the policy, be excluded. Second, generally an insured "who takes out an 'all risk' policy which does not exclude theft has a right to assume he has purchased coverage for loss by theft." *See Tuchman v. Public Service Mutual Insurance Co.*, 88 Misc.2d 336, 387 N.Y.S.2d 803, 805 (N.Y.Civ.Ct.1976) (policy insured for "[a]ll risks of physical loss"). Dayco asserts that the theft occurred when it was induced to part with its goods by a fraudulent scheme or false pretense. Absent an express exclusion in the policy, a theft by trick or false pretense would be covered. *See Camera Mart, Inc. v. Lumbermens Mutual Casualty Co.*, 58 Misc.2d 448, 294 N.Y.S.2d 941, 943, 946 (N.Y.Civ.Ct.1968) (all risks policy covered loss resulting from bad check given by purchaser of camera equipment who stated that he was a representative of "Candid Camera," a frequent buyer of equipment), *aff'd,* 64 Misc.2d 860, 316 N.Y.S.2d 421 (1st Dep't 1969); *U.S. Fidelity and Guaranty Co. v. J.D. Johnson Co.*, 438 So.2d 917, 919 (Fla.App.1983) (loss due to theft not covered where policy specifically excluded theft by "fraudulent scheme, trick, device or false pretense").

Thus, assuming Dayco can demonstrate the existence of a loss by false pretenses, it would be able to recover under the terms of the policy. In order for defendant to show it sustained a loss due to a theft by false pretenses, it must show, among other things, its reliance on the false representations of Reich and FTC. Great Northern asserts that documents have been produced in this matter as well as in the Dayco/FTC action that indicate officials of Dayco knew about Reich's scheme and in fact received part of the commissions generated by and paid pursuant to the allegedly fictitious contracts procured by Reich. *See* Great Northern's Memorandum in Opposition to Dayco's Motion for Partial Summary Judgment, at 4. Such a fact could serve to preclude a finding of theft by false pretenses, and any recovery under the policy. However, on the record before me, I cannot say that there are no outstanding material issues of

fact. Thus, summary judgment would be inappropriate.[1]

## 2. *Transfer of Title of Dayco's Goods*

■ The policy provides for "[a]ll risk, excess and difference in conditions property damage coverage on all real and personal property *of the insured.*" (Emphasis supplied). Great Northern argues that Dayco's loss, if any, is not covered by the policy because it occurred after Dayco transferred title to the goods. The purported contracts apparently provided for delivery either "free on truck ex works Dayco Stuttgard BRD" or "free on truck storehouse Dayco Bremen." Once Dayco's goods were placed on board a Russian ship or truck, Great Northern asserts, title to the goods passed from Dayco to the buyer. *See* New York Uniform Commercial Code (U.C.C.) § 2–401(2) (McKinney 1964); U.C.C. § 2–501(2) (McKinney 1964) (seller has insurable interest "so long as title to or any security interest in the goods remains in him . . . .").

The logical extension of Great Northern's argument would be that a theft by false pretenses loss can never be covered by an all risks policy because in such a case, the loss is established when the policyholder voluntarily parts with title to the property as a result of false pretense or trick. Thus, because I have already held that, assuming the defendant establishes its loss, it may recover under the policy under a theft by false pretenses theory, defendant is not precluded from recovery on the second ground suggested by Great Northern. The relinquishment of control over and title to the goods is the very loss complained of by Dayco.[2]

## 3. *Location of Goods*

■ Great Northern argues that there is no "loss" because Dayco's goods are not lost, they are in Russia, yet Dayco never attempted to recover the goods. The record, however, is simply not clear as to whether Dayco's goods, which were picked up from the Bremen warehouse, are in Russia or were "fenced" to others by FTC and Edith Reich. Apparently, at meetings attended by Huhs, Tractoroexport officials acknowledged receipt of only part of the shipments made by Dayco. Thus, an issue of fact remains as to whether Dayco is indeed ignorant of the whereabouts of its goods or cannot recover them by ordinary diligent search. I note, however, that Great Northern's statement that Dayco never attempted to effectuate the return of its goods is totally unsupported as Dayco retained Huhs who then travelled to the Soviet Union with Dayco officials for the purpose of investigating the existence or nonexistence of the contracts purportedly procured by Reich.[3] In any event, it is

---

**1.** In addition to issues of fact concerning Dayco's knowledge of and acquiescence to Reich's scheme, it is unclear how many contracts were fictitious. Great Northern argues that Dayco has not come forth with any admissible evidence of fictitious contracts and claims that correspondence between Dayco and Tractoroexport indicating that contracts, not the subject of this action, did not exist is irrelevant in this action. I disagree. They are relevant to show that there were some fictitious contracts and there may be more. Furthermore, apparently Edith Reich testified that she caused Dayco to receive fictitious contracts in her examination before trial in the Dayco/FTC action and Dayco, in its answers to interrogatories indicated that it believed certain contracts to be nonexistent based, in part, on Edith Reich's deposition.

**2.** Great Northern's argument that the passage of title left Dayco with an "account receivable,"

which is excluded under the policy, is rejected. The nature of Dayco's claimed loss derives from its reliance on fictitious contracts. Thus, on such contracts, there can be no tangible "account" which would be recognized by the Russians.

**3.** Huhs stated, in an affidavit executed in connection with the Dayco/FTC action that the purpose of the visit to Moscow was "to determine the status of thirteen contracts totalling approximately $117,102,528 which defendants had previously represented were concluded on behalf of Dayco Corporation by [FTC] with three Soviet foreign trade organizations. . . ." Dayco's Opposition Exh. 1 (Affidavit of John I. Huhs ¶ 5). Huhs also stated that an "additional purpose of the visit was to determine the facts surrounding approximately $18,473,484 worth of Dayco products which had been delivered to the U.S.S.R. in connection with the purported contracts with Tractoroexport, and the status of

clear that Great Northern is not entitled to summary judgment precluding Dayco's recovery under the policy on the ground that Dayco has suffered no loss because its goods are recoverable in Russia.

### 4. *Ratification*

The final basis asserted by plaintiff in support of its summary judgment motion is that Dayco ratified the delivery of the goods to Russia by instructing Tractoroexport in March of 1982, after it learned of FTC's fraudulent activities, to pay FTC for the goods erroneously delivered to Tractoroexport but which were accepted by the latter at a lower price than Dayco believed was originally negotiated. In a telex on February 19, 1982, Dayco asked that Tractoroexport not remit payment to FTC for the "4000 mm belts" not ordered by Tractoroexport until Dayco settled its "problem" with FTC. *See* Dayco's Opposition Exh. 5. Thereafter, on March 22, 1982, Dayco telexed Tractoroexport that it had settled its dispute with FTC and that payment "is to be made to [FTC]." Dayco's Opposition Exh. 6.

 Dayco's actions do not constitute a ratification. Ratification requires knowledge of all the material facts. *See Julien J. Studley, Inc. v. Gulf Oil Corp.*, 282 F.Supp. 748, 752 (S.D.N.Y.1968), *rev'd on other grounds*, 407 F.2d 521 (2d Cir.1969). It appears that as of March of 1982, Dayco did not have complete knowledge as to the extent of the fraud. After discovering the fraud, it attempted merely to mitigate its losses through settlement with Reich and

discussions with Tractoroexport concerning goods already received in Russia. On the record before me, I cannot say that there is either circumstantial or direct evidence of an affirmative election by Dayco indicating an intention to adopt the fraudulent activities of Reich. *See Julien J. Studley, Inc.*, 282 F.Supp. at 752.

Accordingly, Great Northern's motion for summary judgment is denied.

### C. *Dayco's Partial Summary Judgment Motion*

Great Northern, in the Seventh Claim of its complaint, alleges that "[t]he loss which Dayco claims [in its proofs of loss] is a single loss rather than a multiple loss," *see* Complaint ¶ 56, and therefore seeks an order limiting Dayco's recovery, if any, to $1,000,000, *see id.* ¶ 57. Dayco had filed twelve proofs of loss, one for each shipment from Bremen, West Germany from January 10, 1981 through November 10, 1981, claiming a total of $6,188,343 in losses.[4]

Dayco argues that with each of the twelve shipments of belts of different sizes and applications, it suffered a separate loss. Great Northern asserts that Dayco's loss, if any, resulted from Edith Reich's scheme which Dayco knew about and which upper level Dayco officials participated in. Great Northern's argument that there are several outstanding issues of fact, including whether Dayco did, in fact, rely on the alleged fraud of FTC or whether Dayco was a participant in the fraud, are not material issues of fact to the narrow ques-

---

approximately $11,844,210 in outstanding accounts receivable connected therewith." *Id.*

**4.** Dayco asserts that the figure of $6,188,343 was arrived at by taking total of the individual shipments' invoice price up to a maximum of $1,000,000 and reducing it by the $4.1 million received in 1981 and applying the $10,000 deductible for each loss.

The twelve shipments occurred on the following dates: January 10, 1981, February 28, 1981, April 2, 1981, June 19, 1981, July 10, 1981, July 23, 1981, July 30, 1981 (two shipments for $96,328 and $101,872, respectively), August 7, 1981, September 17, 1981, September 25, 1981 and November 10, 1981. Dayco's Statement Pursu-

ant to Rule 3(g) ¶ 11. Plaintiff objects to Dayco's statement regarding the twelve shipments on the grounds that Dayco has not produced competent and admissible evidence of the shipments because the bills of lading, submitted by Dayco as exhibits 13 through 24, are only photocopies. Apparently, the duplicate bills of lading had been produced during discovery and used during depositions without objection by Great Northern. On this summary judgment motion, it is inadequate for Great Northern to rest on such a conclusory denial without more. *See* 6 J. Moore, W. Taggart & J. Wicker, Moore's Federal Practice ¶ 56.24, at 56–1432 (2d ed. 1985).

tion of whether there was a single loss or multiple losses. *See Securities Exchange Commission v. Research Automation Corp.*, 585 F.2d 31, 35 (2d Cir.1978).

The policy refers to "any loss at any location." Great Northern argues that because Dayco alleges that the loss occurred at the Bremen warehouse as the result of one fraudulent scheme orchestrated by one individual, it suffered one loss.

■ An insurance policy is a contract which must be interpreted to effectuate the parties' intent. *See American Home Products Corp. v. Liberty Mutual Insurance Co.*, 565 F.Supp. 1485, 1493 (S.D.N.Y. 1983), *modified*, 748 F.2d 760 (2d Cir.1984). To the extent that terms used in an insurance policy are clear and unambiguous, they must be given their plain and ordinary meaning. *See The National State Bank v. American Home Assurance Co.*, 492 F.Supp. 393, 396 (S.D.N.Y.1980). The "policy must be enforced as written, and the Court is not free to modify its terms by judicial construction." *Id.* (citations omitted). Great Northern's policy insures for "any loss at any location not exceeding $1,000,000." As already stated, an all risks policy should be interpreted broadly in favor of the insured.

> [I]t is not sufficient for the all risk insurers' case for them to offer a reasonable interpretation under which the loss is excluded; they must demonstrate that an interpretation favoring them is the only reasonable reading of at least one of the relevant terms of exclusion.

*Pan American World Airways, Inc.*, 505 F.2d at 1000. In the event that Great Northern intended to limit its liability on an "occurrence" or "accident" basis, it could have done so. *Id.* Furthermore, to the extent that any ambiguities exist in the language used in the policy, it is to be resolved in favor of the insured. *American Home Products Corp.*, 565 F.Supp. at 1491.

■ Thus, based on the plain language utilized in the policy and the fact that Dayco suffered a loss each time it shipped its goods of varying specifications over eleven months pursuant to separate shipping instructions, I conclude that Great Northern's suggested interpretation must be rejected. *See General Casualty Co. v. Gunion*, 99 A.2d 643, 646 (D.C.App.1953) (five separate losses found where on five separate occasions over several months, the insured gave money to individual who falsely represented that the money would be used to help the insured's aunt to flee Romania); *Slater v. United States Fidelity and Guaranty Co.*, 379 Mass. 801, 400 N.E.2d 1256, 1261 (1980) (separate losses under all risks policy found where there were several acts of embezzlement by employee over a 5-month period of time).

Plaintiff asserts that "any loss at any location" should be read as "per occurrence." There is some support for the proposition that " 'an occurrence is determined by the cause or causes of the resulting injury.' " *Appalachian Insurance Co. v. Liberty Mutual Insurance Co.*, 676 F.2d 56, 61 (3d Cir.1982); *see also Michigan Chemical Corp. v. American Home Assurance Co.*, 728 F.2d 374, 379 (6th Cir. 1984); *Business Interiors, Inc. v. Aetna Casualty & Surety Co.*, 751 F.2d 361, 363 (10th Cir.1984) (plaintiff's loss of $53,000, the result of embezzlement as to forty checks by one employee, constituted a single occurrence). The rule in the Second Circuit appears to be in accord with the above cases. *See Champion International Corp. v. Continental Casualty Co.*, 546 F.2d 502, 504 (2d Cir.1976) (defective paneling used by 26 different manufacturers constitutes one "occurrence"), *cert. denied*, 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977).

The cases relied on by plaintiff are, however, readily distinguishable. The insurance policy in the instant case differs from the policies in the cases in which an occurrence is determined by the cause in that Great Northern specifically insured defendant for any loss at any location. *See, e.g., Business Interiors, Inc.*, 751 F.2d at 362 (employee dishonesty clause contained no express limitation); *Appalachian Insurance Co.*, 676 F.2d at 61 (policy covered

damages for personal injuries "caused by or arising out of each occurrence"); *Champion International Corp.*, 546 F.2d at 504 (policy insured for products hazards in amount of $100,000 per "occurrence," had a deductible of $5,000 per "occurrence" and provided excess coverage on an "occurrence" basis). Accordingly, Dayco's motion for partial summary judgment is granted. Great Northern's Seventh Claim is dismissed.

In sum, Dayco's motion to strike is denied. Great Northern's summary judgment motion is denied. Dayco's motion for partial summary judgment is granted in that Great Northern's Seventh Claim is dismissed.

SO ORDERED.