**GREAT NORTHERN INSURANCE COMPANY, Plaintiff,**

v.

**DAYCO CORPORATION, Defendant.**

**No. 83 Civ. 8102 (MP).**

United States District Court, S.D. New York.

June 12, 1986.

Amended and Supplemental Findings July 15, 1986.

Kissam & Halpin, by Leslie Trager, Gary R. Greenman, New York City, for plaintiff.

Dickstein, Shapiro & Morin, by Sidney Dickstein, Roslyn A. Mazer, R. Bruce Holcomb, Sheryl L. Sklorman, Washington, D.C., for defendant.

MILTON POLLACK, Senior District Judge.

This is a declaratory judgment action brought by Great Northern Insurance Co. ("Great Northern") seeking a decree that it is not liable, under an all risk property insurance policy, to indemnify its insured, Dayco Corporation ("Dayco"), for a claimed loss of its goods. Dayco counterclaimed for the loss of its goods in the amount of $6,188,343, plus interest and attorneys' fees.

Jurisdiction is based on diversity of citizenship and requisite amount in controversy. Great Northern is a Minnesota corporation, with its principal place of business in Minnesota. Dayco is a Michigan corporation, with its principal place of business in Ohio.

Dayco's claim under the insurance policy is based on the loss of its goods which were taken from it by false pretenses. Dayco's sales agent, Edith Reich, represented to Dayco that she had secured orders from the Russians for Dayco's products. In reliance on Reich's representations as to the existence of the contracts with the Russians and the terms of sale therein, Dayco manufactured goods and sent them to Bremen, West Germany to await pickup by the Russians. Goods, with an invoice price of over $15 million, were then delivered in 13 shipments to Russian ocean and truck carriers and consigned to a Soviet purchasing agency known as Tractoroexport.

Because the Russians denied having made the contracts on which Dayco had released the goods, Dayco never received payment for the goods—except for, as discussed below, a sum which Dayco was unable to attribute to any of the 13 shipments. Upon investigation, Dayco learned that the contracts on which it had relied in surrendering the goods were fictitious; no such contracts had been entered into by the consignee, Tractoroexport.

Proof of this state of facts—that Dayco was deprived of its goods by use of fictitious contracts—was sufficient to establish Dayco's *prima facie* case of a loss under the all risks policy. Great Northern then presented a series of alleged defenses to liability, none of which, however, offset the abstraction of the goods from Dayco under false pretenses, through the use of the fictitious contracts.

Post trial analysis of the documentary record placed before the Court revealed further the extent of Reich's fraudulent scheme—an analysis which Great Northern apparently did not perceive, or if it did, was not argued.

It appears from the records and the testimony developed by Dayco's investigation that there were a double set of contracts— one set made by Reich with the Soviets and the fictitious set which Reich represented to Dayco and on which Dayco relied in

surrendering its goods. Without Dayco's knowledge or consent, Reich sold Dayco's goods to the Russians for several millions of dollars less than called for by the fictitious contracts. This fact is disclosed in the record by comparison of the description of the goods shipped to Russia pursuant to the fictitious contracts and the like description of goods contained in the genuine contracts,[1] under which the Russians received the goods. Payment for the goods under the genuine contracts was sent directly to Reich and FTC.

The course of events established by the evidence is discussed in more detail below.

### Background

Effective November 1, 1976, Great Northern issued an insurance policy to Dayco, known as a foreign property excess and difference in conditions ("D.I.C.") "All Risks" insurance policy, no. 2060–90–93. The All Risks Policy, including its annual renewals, insured Dayco for the period from November 1, 1976 through November 1, 1982. The parties have stipulated that Dayco has paid all premiums due Great Northern and that at all times relevant to this action, the All Risks Policy remained in full force and effect.

The policy insured against "All Risks of Direct Physical loss or damage to property insured ... except as hereinafter excluded." The policy covered an amount not exceeding $1,000,000 for "any loss at any location" and had a $10,000 deductible for property damage.

On July 27, 1982, Dayco filed 6 proofs of loss with Great Northern seeking recovery for goods shipped to Russia by ocean-going vessels from Bremen, West Germany. The proofs sought recovery under the All Risks policy for $5,757,014. On October 21, 1983, Dayco filed 6 additional proofs of loss with Great Northern seeking recovery under the All Risks policy for $431,329, for goods shipped to Russia by truck from Bremen, West Germany.

On October 23, 1983, Great Northern notified Dayco that its claims had been rejected, that the All Risk policy did not cover the losses, and that they were specifically excluded from coverage by the provisions of the policy. This declaratory judgment action was filed by Great Northern on November 7, 1983. The complaint asserted seven contentions for the denial of coverage:

1. that there was no "Direct Physical loss or damage" to the property insured;

2. that the losses were not a "fortuitous event" because they were caused by the illegal and fraudulent actions of Dayco's employees;

3. that the policy specifically excludes coverage for loss "caused by or resulting from .... theft, conversion, or infidelity by any employee of the insured.";

4. that the policy provides that "Accounts, bills, currency, deeds, evidence of debts" is not property covered by the policy;

5. that the policy excludes coverage for damage caused by or resulting from "confiscation by order of any government or public authority."

6. that Dayco failed to comply with the provision in the policy which requires the insured to "employ every reasonable means to protect the property from further damage ..."

7. that to the extent that coverage is provided the policy limits the amount of coverage to $1 million.

On a motion for summary judgment, Judge Duffy dismissed Great Northern's seventh contention; the Judge held that proof of loss of each of the thirteen shipments would constitute proof of a separate loss in each instance under the policy and that each shipment was covered to the limit of $1 million. *Great Northern Insurance Co. v. Dayco Corp.*, 620 F.Supp. 346, 353–55 (1985).

---

**1.** These genuine contracts were discovered during the pretrial discovery in *Dayco Corporation v. Foreign Transactions Corporation* 82 Civ. 3354 (S.D.N.Y. Oct. 14, 1984).

## FACTS

Dayco is engaged in the manufacture and sale of rubber and plastic belts and hoses used in automobiles, trucks and tractors. Although the majority of Dayco's sales are domestic, Dayco has an International Division. Dayco secures business in foreign countries through sales agents, distributors, or through direct contacts with customers. The foreign sales agents are compensated by commissions on the amount of the sales. The amount of the commissions vary depending on the type of sale; commissions range from 3% to 15% of the amount of the sales. Dayco frequently pays commissions to its sales agents in advance of payment from the customer.

In 1976 Dayco began sales of its products to the Soviet Union. The Soviet Union purchases goods manufactured outside Russia through purchasing agents called Foreign Trade Organizations ("FTOs"). Different FTOs specialize in purchasing particular products to be distributed to various Soviet industries. Between 1976 and 1979, Dayco sold between $1 to $1.5 million worth of 4000 mm V-belts per year to Tractoroexport, a Soviet FTO. These sales were secured by Dayco's sales agent, Jeffrey Nutter, who received a commission based on a percentage of the selling price; the commission was usually around 3%.

### Relationship with Edith Reich

In May 1979, Edith Reich approached Dayco; she identified herself as a sales agent who did a great deal of business in the Soviet Union and said that she wanted to do business with Dayco. During the spring and summer of 1979, Dayco began talking to Edith Reich about the possibility of having her company, Foreign Transactions Corporation ("FTC"), represent Dayco in the sale of its products to the FTOs. Mrs. Reich claimed that there were enormous business opportunities in Russia and that through her extensive contacts in the Soviet Union, she could sell substantial quantities of Dayco's products.

Reich also told Dayco officials that she had represented numerous United States firms, such as Miles Laboratories and Uniroyal, in their business in the Soviet Union. Dayco made inquiries about Reich, with Uniroyal and Miles Labs, and received favorable reports.

Throughout the meetings between Dayco and Reich, Dayco personnel were impressed with the professional manner in which Reich handled herself, and the extensive knowledge of Russia and familiarity with technical information which she displayed. They were convinced that she had numerous connections in the Soviet Union and that she could generate substantial business for Dayco.

On July 1, 1979, a Commercial Representative Agreement was entered into between Dayco and Reich's company, FTC. The agreement appointed FTC as the exclusive representative of Dayco in the Soviet Union for the sale of industrial and automotive V-belts and provided that FTC would be entitled to the difference between the price at which FTC sold Dayco's products and the price quoted by Dayco to FTC, as compensation.

In the fall of 1979, Reich made several trips to the Soviet Union. In November 1979, Reich informed Dayco that Raznoimport, a Soviet FTO, had placed an order for Dayco's "Super Blue Ribbon V-Belts" totalling $1,656,680.

On November 15, 1979, a new Commercial Representative Agreement was entered into. This agreement contained terms similar to the July agreement in that Reich was still compensated through the differential between the price Dayco quoted and the price which Reich obtained in the sale. The only difference was that the new agreement provided that Dayco would advance up to 10% of the amounts due. Prior to November 15, 1979, there was no formal agreement which provided for advances of commissions; however, Dayco previously had authorized advances to be made to Reich. Dayco believed that such advances were necessary to help cover the high expenses which Reich would incur in developing market opportunities in the Soviet Union.

Under the arrangement between Dayco and FTC, FTC would enter into agreements with the FTOs for Dayco's products. Dayco would receive a letter from FTC stating that a particular contract had been procured and the terms of sale therein. Dayco would then manufacture the goods described in the letter. After the goods were produced in Dayco's factory in Springfield, Missouri, they were transported to Charleston, South Carolina for shipment abroad. They were then sent to a warehouse in Bremen, West Germany, where the goods were to be stored until they were picked up by the Soviets.[2] The goods were not shipped by Dayco directly to the Soviet Union because, during this period, due to the Soviet Union's actions in Afghanistan, longshoremen refused to load cargo onto vessels bound for the Soviet Union.

Payment for the goods was not to be made until the goods were loaded on transports bound for Russia. Once ocean or truck bills of lading were obtained for the goods, all documents relating to the sale and shipment of the goods were sent to the First National Bank of Chicago and then forwarded to the Bank for Foreign Trade of the USSR. Upon the receipt of these documents, payment was to be forwarded from the Bank of Foreign Trade to the First National Bank of Chicago and then to Dayco.[3]

Reich kept her relationship with the Russians closely guarded. She insisted that Dayco maintain secrecy concerning its business dealings with the Russians and that Dayco not contact the Soviets directly. Dayco management complied with her requests believing that Reich was merely trying to protect her valuable contacts, as would any sales agent. Although Dayco did not have direct contact with the Russians, Reich forwarded telexes to Dayco purporting to come from the Soviet FTOs confirming the orders, delivery requirements, and receipt of the goods.

Reich kept all contracts which she had secured on Dayco's behalf in her possession. Throughout their dealings, Reich took the position that she was not obligated to provide Dayco with copies of the contracts. However, from time to time, Reich permitted certain Dayco employees to review copies of contracts at FTC's offices in New York.[4]

Reich made numerous trips to the Soviet Union on Dayco's behalf in 1980 and 1981; she represented to Dayco that she had entered into numerous contracts with the Russians for Dayco's products. During the years 1980 and 1981, Reich represented to Dayco that she had secured orders from three Soviet FTOs on Dayco's behalf totalling over $100 million.[5] The orders were

---

2. Goods supplied on alleged orders from Avtopromimport, a Soviet FTO, were sent, on Reich's instructions, to a warehouse in Linden, New Jersey which Dayco was told was owned by the Russians. Dayco makes no claim herein for these goods.

3. In 1981, the method of collection was changed. Instead of presenting drafts for payment through First National Bank of Chicago, Dayco presented the drafts for the Russians through Reich.

4. In June 1981, Dayco's Controller and two other Dayco employees went to FTC's offices in

New York, where they examined copies of the alleged contracts with the Russians; they were told that the original contracts could not be examined because they were in FTC's office in London.

In addition, Reich gave Dayco a copy of the first Tractoroexport contract, Contract number 0295 and Addendum I thereto in early 1980, and in the spring of 1980, she gave Dayco other Addenda allegedly related to this contract. Reich also gave Dayco a copy of contract number 0509 and one of the Raznoimport contracts.

5. Reich and FTC delivered documents to Dayco representing that FTC had secured on Dayco's behalf the following orders:

| Russian FTO | Contract Number | Date of Order | Invoice Price |
|---|---|---|---|
| Tractorexport | 61–09/0295 | 1/17/80 | $ 2,059,200 |
| | Addendum I | 1/17/80 | 435,305 |
| | Addendum II–1 | Spring 1980 | 5,586,000 |

for a variety of Dayco products and represented a tremendous increase in Soviet business for Dayco; Dayco's sales had previously consisted of only one type of belt and had been made to only one Soviet FTO.

Reich and FTC received commissions of approximately $13 million on these orders. Until March 1980, Reich's commission was based on the differential between the price Dayco quoted and the price actually charged to the Russians. In March 1980, the method by which Reich was compensated was altered. Reich received a commission of 10% of the amount of the sales; the commission was payable at the time the goods were sent to Bremen. This change in payment was made because of the substantial business which Reich had generated for Dayco.

In reliance on the alleged contracts secured by Reich, Dayco produced and sent millions of dollars worth of goods to Bremen, West Germany to await pickup by the Russians. Most of the goods sent to Bremen were, however, never picked up by the Russians because the contracts which Reich had represented to Dayco were fictitious. Dayco was eventually able to recover these goods from the Bremen warehouse and to sell them. Because these goods were recovered, they are not a part of Dayco's claim under the insurance policy.

Dayco's claim under the insurance policy consists only of those goods which were actually shipped to the Soviet Union. These goods were also manufactured and sent to Bremen in reliance on fictitious contracts with the Russians. However, as part of her fraudulent scheme, Reich sold these goods to the Russians, without Dayco's knowledge or consent, pursuant to contracts of which Dayco was unaware and at prices which were lower than those which she had represented to Dayco. These goods were picked up by the Russians in Bremen, West Germany and shipped to Tractoroexport, a Soviet FTO. From January 10, 1981 through November 10, 1981, 13 shipments of goods, with an invoice price of $15,732,400, were consigned from the warehouse in Bremen to Tractorexport, in the Soviet Union. It is these thirteen shipments on which Dayco bases its claim of loss under the policy.

### The Thirteen Shipments

In January 1980, Reich informed Dayco that it had secured a contract from Tractoroexport on Dayco's behalf for V–Belts, totalling $2,494,505. (Contract 0295 and

| Russian FTO | Contract Number | Date of Order | Invoice Price |
|---|---|---|---|
| | Addendum II–2 | Spring 1980 | $1,268,400 |
| | Addendum III–1 | 6/13/80 | 552,750 |
| | Addendum III–2 | 6/13/80 | 940,000 |
| | Total | | 10,841,655 |
| | 61–09/0509 | 6/13/80 | 2,027,860 |
| | 81–09/087981 | 9/18/80 | 46,298,500 |
| | Addendum | 2/15/81 | 2,592,000 |
| | Total | | 48,890,500 |
| | 61–09/1324 | 3/13/81 | 883,378 |
| Raznoimport | 68–32/97617 | 11/13/79 | 1,656,680 |
| | 7468–97987 | 4/10/80 | 760,800 |
| | 35–0/04168–637 | 6/24/80 | 2,555,000 |
| | 36–01/03058–422 | 6/24/80 | 6,288,755 |
| | 34–0/03157–423 | 6/24/80 | 1,095,000 |
| | 34–03/13779–32 | 8/26/80 | 6,389,000 |
| | 68–36–99387–34 | 9/25/80 | 25,221,750 |
| Avtopromimport | 34–03/03119622 | 7/25/80 | 6,775,000 |
| | 34–03/03122–422 | 8/04/80 | 3,391,500 |

Addendum I). The belts were produced by Dayco and sent to the warehouse in Bremen, West Germany. During the period April 2 through July 3, 1980, Dayco shipped the goods called for under this order to Tractoroexport. Seven payments totalling $2,494,505 were received by Dayco during the period July 2, 1980 through September 15, 1980.[6]

In February/March 1980, Reich informed Dayco that there were additions to the contract 0295 with Tractoroexport. At that time, Reich sent Dayco two addenda to contract 0295, Addenda II–1 and II–2, totalling $6,854,400. It was subsequently discovered that these addenda were fictitious.

In June 1980, Reich informed Dayco of a second addition to contract 0295. This addition was represented by Addenda III–1 and III–2 and totalled $1,492,750. Both orders were entered at the factory for immediate production and the goods were sent to Bremen, West Germany. Like addenda II–1 and II–2 to contract 0295, these addenda were also discovered to be fictitious.

Reich also informed Dayco, in June 1980, that she had secured a contract from Tractoroexport, contract 0509, for SPC belts, with an invoice price of $2,027,860.[7]

In September 1980, Dayco received a letter from Reich informing Dayco that Reich had received a large contract from Tractoroexport, totalling $46,298,500. (Contract 087981) In the early part of 1981, Reich called Dayco from the Soviet Union to inform Dayco that there was an addition to this order. Reich also told Dayco that certain quantities of the original order were needed urgently and that they should be given top priority. It was later discovered that the Russians had not entered into contract 087981 or Addendum I thereto.

In March 1981, Reich informed Dayco of a contract with Tractoroexport for $883,378 for SPC belts. (Contract 1324)

Upon receipt of these Tractoroexport orders from Reich,[8] Dayco began production of the goods and sent them to the warehouse in Bremen, West Germany. By the fall of 1980, a substantial quantity of merchandise had accumulated in the warehouse in Bremen waiting to be picked up by Russian vessels or trucks. In December 1980, there was approximately $20 million worth of goods in Bremen awaiting shipping instructions.

During this time, Dayco expressed concern to Reich over the delays by the Soviets in picking up the merchandise. Mrs. Reich explained that the delays were due to the fact that the Russians were using their vehicles in Poland and Afghanistan to deal with problems that had arisen in these countries. Dayco confirmed through its own inquiries that Russian vehicles were not available.[9]

In December 1980, Dayco suspended the payment of advance commissions to Reich to attempt to pressure her to obtain pickups of the goods.[10] On January 10, 1981 a

---

**6.** The goods shipped pursuant to contract number 0295 and Addendum 1 are not part of Dayco's claim since the contract and addendum 1 were genuine and payment was received for the goods shipped pursuant thereto. Dayco's claim does, however, include goods shipped pursuant to Addenda II and III to contract 0295 since these addenda were fictitious.

**7.** This contract is not a part of Dayco's claim since no goods were shipped to the Soviet Union pursuant to it.

**8.** During this time period, Reich also informed Dayco about orders for Dayco's products from two other Soviet FTOs, Raznoimport and Avtopromimport. Goods were produced pursuant to these orders and sent to warehouses in Bremen, West Germany and Linden, New Jersey. The goods were, however, never shipped to the Soviet Union. Dayco eventually recovered the goods from the warehouses and sold them in the domestic and international markets. Consequently, these goods are not a part of Dayco's claim under the insurance policy.

**9.** Dayco was also told that a Russian vessel which was enroute to Bremen to pick up Dayco's products was caught in a storm in the Baltic sea. Dayco checked this information with the weather bureau and found it to be true.

**10.** At this time, Dayco also slowed down production of goods pursuant to the contracts because it did not want to accumulate too large a quantity of inventory in Bremen. Dayco only produced goods which Reich said were urgently needed.

Russian vessel picked up $3.2 million worth of goods; shortly thereafter, Dayco resumed the payment of advance commissions to Reich.

Throughout the year, other pickups of goods were made by the Russians. However, during the entire period, delays in obtaining pickups were constantly experienced. The delays were a continuous source of tension in Dayco's relationship with Reich. Dayco personnel had numerous discussions with Reich in which they attempted to pressure her to get the Russians to pick up the goods; Dayco also threatened not to pay Reich her commissions in advance, until the goods were picked up. Dayco believed that Reich was a good sales person, but that she did not follow through on the details of arranging the shipments. They believed that if they continued to keep pressure on her they would get pickups.

From January 10, 1981 through November 10, 1981, goods, with an invoice price totalling $15,723,400, were picked up in Bremen and transported to the Soviet Union. Dayco received shipping instructions as to when a Russian vessel or truck would be available to pick up the goods from Reich. Reich also relayed to Dayco information as to the contract number pursuant to which the goods would be shipped,[11] the consignee, the trans number,[12] and the type of products and the quantity which were to be shipped. The goods were then loaded on Russian vessels or trucks and shipped to Russia. The shipments from Bremen, West Germany to the Soviet Union were as follows:

| Date of Shipment | Invoice Price | Shipped Pursuant to Contract Number |
|---|---|---|
| January 10, 1981 | $3,204,251 | 61–09/0295 Addenda II–1, II–2, III–1 |
| February 28, 1981 | $2,943,480 | 0295 Addendum II–1 |
| April 2, 1981 | $3,107,840 | 0295 Addenda II–1 & III–2 and 81–09/087981 |
| June 11, 1981 (not included in claim) | $ 272,434 | 61–09/1324 |
| June 18, 1981 | $ 102,620 | 61–09/1324 |
| July 10, 1981 | $ 196,213 | 1324 |
| July 23, 1981 | $3,415,873 | 087981 & Addendum |

11. The order number for goods shipped in 1981 pursuant to contract numbers 087981 and 0295 was subsequently changed by Reich. Reich told Dayco that the money for these 1980 contracts had been allocated only for that year and that because the goods were not shipped until 1981, they had to be shipped pursuant to a different order number. The new order number was 1246. Dayco believed that this number did not refer to a different contract, but only referred to a new number to be used for shipment. On the first two shipments which were made pursuant to contract number 0295, Dayco used both the old and new numbers; on the subsequent shipments, only the new contract number was employed.

It was discovered later, during the pretrial discovery in *Dayco Corp. v. Foreign Transactions Corp.*, that contract number 1246 referred to a genuine contract which Reich had entered into with the Russians, but of which Dayco was not aware. Contract number 1246 called for most of the same belt types which were ordered in Contract Numbers 0295 and 087981; however, the prices and quantities of the goods ordered differed.

12. A trans number is the number used by the Russians to designate the FTO to which goods would be shipped and the appropriate warehouse. Trans numbers were printed on the cartons of goods and on all shipping documents. Shipments to the Soviet Union could not be made without a trans number. The 13 shipments of goods which Dayco made to Russia were made pursuant to trans numbers supplied by Reich.

| Date of Shipment | Invoice Price | Shipped Pursuant to Contract Number |
|---|---|---|
| July 30, 1981 | $ 96,328 | 1324 |
| July 30, 1981 | $ 101,872 | 1324 |
| August 7, 1981 | $ 44,458 | 1324 |
| September 17, 1981 | $1,245,394 | 087981 & Addendum |
| September 25, 1981 | $ 69,453 | 1324 |
| November 10, 1981 | $ 923,184 | 087981 & Addendum |

For each shipment, after the goods were loaded on Russian vessels or trucks, an invoice, a packing list, and the bill of lading were sent to the First National Bank of Chicago to be forwarded to the Bank of Foreign Trade for the USSR.

In April 1981, Dayco was notified by the First National Bank of Chicago that the Bank of Foreign Trade for the USSR refused payment for the first shipment because Dayco's prices did not correspond to those stated in Tractoroexport's contract. Reich told Dayco that the reason that this first draft was not paid was that some of the goods which were to be shipped were not included in the shipment. Reich told Dayco that once the bill of lading for the missing belts was supplied, Dayco would receive payment.

In June and July 1981, Dayco received monies from the Russians totalling $4,134,-807.[13] When the funds were received, Dayco was unable to attribute them to any specific shipment.[14] The payments were thus credited to Tractoroexport's account for the goods shipped in 1981.[15] Dayco did not receive any additional payments for the goods shipped to Russia.

### Discovery of the Fraud

As a result of questions raised by Dayco's outside auditors, Ernst & Whinney, as to the accounting treatment of the sales to the Soviet Union, Dayco retained the law firm of Pisar & Huhs to investigate its sales to the Russians. Dayco asked John Huhs, a partner in the firm who is fluent in Russian and had extensive experience in international trade, to make discreet inquiries of the three FTOs with which Reich had purportedly concluded contracts for Dayco's products—Raznoimport, Avtopromimport, and Tractoroexport—concerning their business relationships with Dayco and FTC.

In December 1981, Mr. Huhs contacted officials at each of the FTOs in Moscow. The official from Tractoroexport said that the company had done business with Dayco through Edith Reich and FTC and that the contracts were all in order; as far as they were concerned, there were no deliveries nor payments outstanding to be made. The officials from the two other FTOs stated that they had no business dealings with Dayco, FTC or Reich in 1980 and 1981.

Next, Dayco sent telexes to each of the FTOs in an attempt to confirm the details of the contracts which Reich had represented to Dayco. Tractoroexport responded that it had no knowledge of the existence of many of the contracts to which Dayco referred. Specifically, Tractoroexport stated that it did not make two of the contracts referred to in Dayco's telex, numbers 0509 and 087981, and that it had not entered into contracts for SPC belts and V-belts in the

---

13. The payments were received as follows:

    June 23, 1981  $ 783,007.57
    June 30, 1981  $2,369,419.46
    July 13, 1981  $ 982,380.63

14. Dayco's outside auditors also noted that the payments received from the Russians did not conform to Dayco's drafts.

15. In 1982, during pretrial discovery in the case of *Dayco Corporation v. Foreign Transactions Corporation,* Dayco personnel found two genuine contracts which Reich had made with the Russians. Using the quantities and prices in those contracts, Dayco was able to allocate the funds received by applying the monies against its claims on a first in first out basis.

"quantities and nomenclature" stated in Dayco's telex.[16]

Dayco also asked the U.S. Commercial Office of the United States Embassy in Moscow to contact the FTOs independently about the contracts. The Commercial Office confirmed the information in the Tractoroexport response.

In January 1982, Huhs and two Dayco officials went to Moscow to meet with the FTOs. Prior to their meeting with Avtopromimport, Reich's daughter, who was an employee of FTC, informed the Dayco delegation that the additional contracts with Avtopromimport were fictitious; she also signed a statement to this effect.

The next day the Dayco delegation was scheduled to meet with Raznoimport. Shortly before the meeting, Edith Reich telephoned them and admitted that the seven Raznoimport contracts which she had presented to Dayco did not exist. At the meeting with Raznoimport, this admission was confirmed; the Raznoimport representatives said that they had not done any business with Dayco since 1979, when a contract for a small quantity of belts was concluded.

The following day, the Dayco delegation met with Tractoroexport representatives to determine the status of the contracts and the goods shipped. The representatives told them that as far as their records were concerned, everything was up-to-date between Tractoroexport and FTC regarding Dayco's products: everything that had actually been ordered had been delivered and all payments due had been made. They also admitted that in 1981, they had been sent V-belts which they had never ordered and that after considerable effort they had sold the unordered belts and had authorized payment for them to be made to FTC. When asked about the whereabouts of Dayco's goods which were delivered, Tractoroexport told Dayco that they no longer had the merchandise and had no knowledge of the whereabouts of the goods.

After repeated questioning, Tractoroexport representatives refused to give the delegation any further information about their dealings with FTC and suggested that Dayco put its questions in writing. The representatives maintained that they had entered into contracts with Reich and FTC and that they could not discuss these dealings with outside parties. Upon the delegation's departure, one of the representatives slipped Mr. Huhs a note which stated that Tractoroexport had concluded two contracts with FTC for Dayco belts for delivery in 1981: Contract No. 61–09/1246 and No. 61–09/1324.

On the basis of these investigations and his expertise in Soviet trade, Huhs concluded that the majority of the contracts which Reich had allegedly secured on Dayco's behalf were fictitious. Huhs concluded that only two of the contracts were genuine: the first contract with Tractoroexport, number 0295 and Addendum I thereto,[17] for which Dayco was paid, and contract number 1324.[18] From his investigations, Huhs also learned that the Russians had entered into a contract with Reich and FTC for Dayco's goods, contract number 1246, about which Dayco was previously unaware.

In May 1982, Dayco brought an action for fraud and breach of contract against Reich and her company in the Southern District of New York. This action was for the commissions which Dayco had paid Reich on the fictitious contracts.[19] During the pretrial discovery in this action, Dayco found copies of two genuine contracts which FTC had entered into with the Russians; the contracts were: contract number

---

16. Raznoimport also responded that it had no knowledge of the existence of the contracts referred to by Dayco. Avtopromimport did not respond to the inquiry.

17. However, Huhs concluded that Addenda II and III to contract 0295 were fictitious.

18. However, the sales price represented to Dayco for this contract was $883,378 and the sales price with Tractoroexport was only $446,801.

19. On October 12, 1984, a default judgment of $19 million was entered against Reich and FTC in this action.

1324, one of the contracts which Reich had presented to Dayco and pursuant to which Dayco had shipped goods; and contract number 1246, the contract which the Tractoroexport representative had referred to as a genuine contract and of which Dayco was previously unaware.

Contract number 1324 was entered into by Tractoroexport and FTC in March 1981. Although Dayco was aware that a contract number 1324 was concluded by Reich with the Russians in March 1981, the contract number 1324 which Reich represented to Dayco and on which Dayco relied in shipping its goods differed from the genuine contract number 1324 in that the total sales price was $883,378; whereas, the total sales price for the genuine contract was $446,801.

Contract number 1246 was entered into by Tractoroexport and FTC in December 1980. It called for most of the same belt types as those that were ordered in the fictitious contracts number 087981 and Addenda II and III to contract number 0295; however, the prices and quantities of the goods ordered differed.[20]

The total invoice price of contract 1246 was $2,784,500. There were also a number of addenda to this contract. Addendum I was entered into in March 1981 and had a total invoice price of $1,596,900.

Addenda 2 and 3, which are dated May 1981, refer to the fact that 169,440 pieces of the 4000 V-belt and 125,000 pieces of the 2360 V-belt which had not been ordered had been delivered to Tractoroexport, and state that Tractoroexport agrees to buy all of the overshipped 2360 belts and 32,000 pieces of the 4000 belts. The remainder of the 4000 belts which were overshipped were to be stored by Tractoroexport.

Addendum 4, dated November 1981, provides for the sale of the remainder of the 4000 belts which were overshipped, at a discounted price.

The types and quantities of belts ordered in Contract 1246 and its addenda are almost identical to the types and quantities of the belts which Dayco actually shipped to Russia pursuant to the fictitious contract number 087981 and Addenda II and III of contract 0295.

In examining these two genuine contracts, the statements made by the Tractoroexport representatives as to the genuine contracts which they had concluded with FTC, and the evidence at trial concerning the representations which Reich made to Dayco, the details of Reich's fraudulent scheme become clearer. Reich induced Dayco to ship its goods pursuant to fraudulent representations as to the existence of contracts with the Russians and the terms of sale contained therein. In reliance on these contracts, and the prices contained therein, Dayco surrendered its goods. In fact, the contracts which Reich had represented to Dayco and on which Dayco relied in shipping its goods were fictitious.

As part of her fraudulent scheme, Reich sold Dayco's goods, without Dayco's knowledge or consent, pursuant to two genuine contracts, numbers 1246 and 1324, which contained terms of sale different than those represented to Dayco. The price at which Reich actually sold Dayco's goods was lower than the price which Dayco relied in shipping its goods. In addition, payment for the goods under the genuine contracts were sent directly to Reich and FTC.

Dayco was deprived of its goods through Reich's fraudulent scheme. The goods which Dayco shipped to Russia had a total invoice price of over $15 million. Dayco received payment of approximately $4.1 million from the Bank for Foreign Trade of the USSR, reducing its loss for the goods to approximately $11 million. Because of the $1 million per loss limit in the policy,

**20.** The quantity of goods ordered in contract 1246 and addenda thereto was substantially less than that allegedly ordered in the fictitious contracts, numbers 087981 and Addenda II and III to Contract 0295. Not all of the goods ordered pursuant to these two fictitious contracts were, however, actually shipped to Russia. The quantity of goods which were actually shipped to Russia pursuant to these two fictitious contracts is almost identical to the quantity ordered in contract 1246 and its addenda.

Dayco cannot recover more than $1 million for each shipment of goods; Dayco's claim to Great Northern is consequently for $6,188,343.

During the investigation of Dayco's dealings with Reich, Dayco also discovered that two of its employees had received money from Reich during the period from the summer of 1980 through February 1981. It was determined that Edwin Gordon, a Senior Vice President and Director of Dayco who was responsible for dealing with the transactions with Reich and FTC on a day-to-day basis, had received $122,500 from Reich and that Jeanette Curry, the manager of the the Eastern European Operations of the International Division, had received $133,000 from Reich.[21] Gordon and Curry's employment from Dayco was terminated on August 30, 1982.[22] Both employees have paid all the money received from Reich to Dayco.[23]

No evidence was presented at trial to demonstrate that these two employees were involved in Reich's fraudulent scheme or that either of them knew about the fraud.

## DISCUSSION

### I. Burden of Proof

■ Under an all risks policy, the insured has the burden to establish a *prima facie* case for recovery. The insured need only prove the existence of the all risks policy, and the loss of the covered property. *See Pan American World Airways, Inc. v. Aetna Casualty and Surety Co.*, 505 F.2d 989, 999 (2d Cir.1974). The very purpose of an all risks policy is to protect the insured in cases where it is difficult to explain the disappearance of the property; thus, the insured need not establish the cause of the loss as part of its case. *See Atlantic*

*Lines Limited v. American Motorists Insurance Co.*, 547 F.2d 11, 13 (2d Cir.1976); *Holiday Inns Inc. v. Aetna Insurance Co.*, 571 F.Supp. 1460, 1463 (S.D.N.Y.1983).

■ Dayco has demonstrated, by competent and admissible evidence, that its sales agent, Edith Reich, made representations that she had secured the contracts with the Russians as reported to Dayco; that Dayco genuinely believed Reich's representations and released the goods to the Russians in reasonable reliance on the alleged contracts; that Reich's representations were false in that the contracts which Reich presented to Dayco were not made; that as a result of its reliance on Reich's fraudulent representations, Dayco was deprived of its goods; and that Dayco had been unable to recover those goods. This evidence is sufficient to establish a *prima facie* case for recovery.

■ Once the insured has established a *prima facie* case, the insurer must prove that the claimed loss is excluded from coverage under the policy; the insurer must show that the loss was proximately caused by the excluded peril. The burden on the insurer is especially difficult because the exclusions will be given the interpretation which is most beneficial to the insured. It is not sufficient for the insurer to offer a reasonable interpretation under which the loss is excluded; it must demonstrate that an interpretation favorable to it is the only reasonable reading. *See Pan American*, 505 F.2d at 999–1000.

■ Great Northern based its case at trial on two exclusions contained in the insurance policy: an employee infidelity exclusion and a provision requiring the in-

---

21. Curry also received gifts from Reich, including clothing and jewelry.

22. Because of her familiarity with the FTC business, Curry was hired by Dayco in January 1983, as a consultant to assist in litigation concerning the FTC transactions.

23. Curry returned all gifts received from Reich. She also paid Dayco $25,000 from the funds received from Reich. Curry gave Dayco a promissory note for the balance of the money received; the balance will be returned to Dayco when Curry sells her home. Curry is currently making monthly payments to Dayco.

sured to protect the property from further damage.[24]

## II. Exclusion for Employee Infidelity

Great Northern argued at trial that two of Dayco's employees who were the most intimately associated with Edith Reich and the FTC transaction—Edwin Gordon, Senior Vice-President, and Jeanette Curry, Manager of the International Division—received over $100,000 each from Reich and that these two individuals aided Reich in her fraudulent scheme. Great Northern thus contends that Dayco's losses are excluded by the employee infidelity exclusion in the policy.

The policy provides that it "does not insure against physical damage caused by or resulting from: ...

i) Theft, mysterious disappearance, conversion or infidelity by an employee of the insured. Actual physical damage to the Insured's property as a result of a willful act of malicious intent shall be deemed not to be an act of infidelity;"

■ The phrase "caused by or resulting from" in reference to an excluded peril requires the insurer to prove that the excluded peril is the proximate cause of the loss. See Pan American, 505 F.2d at 1006. The concept of proximate cause when applied to insurance policies is a limited one; New York courts give an especially narrow scope to the inquiry. See id. at 1006. "[T]he horrendous niceties of the doctrine of so-called 'proximate cause' employed in negligence suits applies in a limited manner only to insurance policies." New York, New Haven & Hartford Railroad Co. v. Gray, 240 F.2d 460, 465 (2d Cir.1957).

■ In the context of insurance policies, "the causation inquiry stops at the efficient physical cause of the loss; it does not trace events back to their metaphysical beginnings." Pan American, 505 F.2d at 1006. The concept of proximate cause is what the average person would ordinarily think of as the cause of the loss. See Cincotta v. National Flood Insurer Association, 452 F.Supp. 928, 930 (E.D.N.Y. 1977).

[T]he common understanding is that in construing [insurance] policies we are not to take broad views but generally are to stop our inquiries with the cause nearest to the loss. This is a settled rule of construction, and if it is understood, does not deserve much criticism, since theoretically at least the parties can shape their contract as they like. Queen Insurance Co. v. Globe & Rutgers Fire Insurance Co., 263 U.S. 487, 492, 44 S.Ct. 175, 176, 68 L.Ed. 402 (1924) (Holmes, J.).

---

**24.** Although Great Northern's case at trial was confined to these two exclusions, its complaint contained four other claims of exclusion: that there was no direct physical loss or damage; that the loss was of an account receivable which is property not covered by the policy; that the loss was not a fortuitous event; and that the loss was caused by "confiscation by order of any government or public authority" and thus excluded by the policy. No evidence was presented in support of any of these claims.

Dayco's loss of goods, due to its reliance on Reich's fraudulent representations, was clearly a direct physical loss of the goods. To hold otherwise would mean that a theft by false pretenses would not be covered by an All Risks policy; however, it is well established that an All Risks policy provides coverage for a theft by false pretenses. See Camera Mart, Inc. v. Lumbermens Mutual Casualty Co., 58 Misc.2d 448, 294 N.Y.S.2d 941 (N.Y.Civ.Ct.1968).

Moreover, Dayco's loss was not a mere credit loss or a loss of an account receivable. Dayco's loss was due to its reliance on fictitious contracts. Thus, there was no account which would even be recognized by the Russians.

In addition, Dayco's loss was fortuitous. There was no showing that Dayco was involved in the fraudulent scheme which caused its loss or that any of Dayco's management participated in the fraud, with Dayco's assent or to Dayco's benefit. See 18 Couch on Insurance 2d § 74:672 at 991 & § 74:674 at 994.

Finally, Dayco's loss was clearly not caused by a confiscation of the goods by order of a government or public authority. Even if Tractoroexport is considered to be a government or a public authority, its actions cannot be described as a confiscation of Dayco's goods. Moreover, the Soviet's actions did not proximately cause Dayco's loss; it was Reich's fraud which caused the loss.

Accordingly, Great Northern has failed to prove that any of these four claims of exclusion applies to Dayco's loss.

In this case, the evidence clearly demonstrates that Edith Reich was the cause of Dayco's loss. It was Reich who presented the fictitious contracts to Dayco and induced Dayco to produce and ship goods pursuant to the contracts. Reich's actions were the direct and precipitating cause of Dayco's loss; no loss would have occurred without Reich's fraud.

Although it was shown that Gordon and Curry accepted money from Reich, this fact is not sufficient to establish that the employee infidelity exclusion applies to Dayco's loss. Great Northern had the burden of proving that the dishonest acts of Curry and Gordon were the proximate cause of the loss. Great Northern failed to satisfy this burden since there was no proof that either Curry or Gordon were co-conspirators with Reich or that either of them were involved, in any way, in Reich's fraudulent scheme. *Cf. Cordin Motor Freight, Inc. v. Allstate Insurance Co.*, 58 Ill.App.3d 585, 16 Ill.Dec. 152, 374 N.E.2d 927 (1978) (holding that an employee infidelity exclusion applied where the employee was a co-conspirator in the theft); *Sills v. Boston Old Colony Insurance Co.*, 356 So.2d 1335 (Ct.App.Fla.1978) (same).

There was no evidence that either Gordon or Curry knew that the contracts presented by Reich were fictitious, or that either of them participated, in any manner, in Reich's fraud. Both Gordon and Curry testified credibly to the effect that they always believed that the contracts with the Russians were valid and would be fulfilled; and that they did not know that the contracts were fictitious or that the orders as submitted to Dayco did not represent actual orders. No evidence was presented which in any way contradicted this testimony.

Moreover, the evidence showed that Curry, as manager of the International Division, did not have the authority or capability of varying any aspect of Dayco's transactions with FTC to the benefit of Reich. Curry could not authorize commissions, sign checks or enter orders with the factory, without the approval of senior management. The same was equally true of Gordon. Although Gordon was involved in negotiating Reich's commissions, a number of other Dayco officers also participated in the calculation of the commissions; Gordon could not set Reich's commissions without their approval.

Great Northern's only argument in support of its claim that employee infidelity had caused Dayco's loss was that Gordon falsely told Dayco that he had seen the contracts which Reich had presented to Dayco. Great Northern asserts that if Gordon had not lied, Dayco would not have suffered a loss. This argument is unpersuasive since Dayco's loss was not in any way caused by Gordon's representation that he had seen the contracts. Even if Dayco had known that Gordon had not seen the contracts, this fact would not have prevented the loss. At least two other Dayco employees examined the contracts; Dayco reliance on the contracts was not based on Gordon's statement.

Moreover, to say that Gordon's misrepresentation "caused" the loss, misconstrues the concept of causation in the context of insurance policies. At the most, the misrepresentation may have aided Reich in her fraudulent scheme; however, Reich's fraud was still the cause of the loss.

At trial, Great Northern's counsel admitted that the most the evidence could possibly show was that Curry and Gordon were a contributing cause to Dayco's loss.[25]

---

**25.** At trial the Court asked Great Northern's counsel, Mr. Trager: "In other words, the maximum position that you could possibly take is that Gordon and Curry were at most a contributory factor rather than the sole cause."

Mr. Trager: "I think that is by definition true. And I would submit to your Honor—"

Court: "What's by definition true?"

Mr. Trager: "That where you have a bribe situation, you must have a bribee and a bribor."

Court: "I am talking about the loss. Not the fact that there is a briber and a bribe taker. Was the loss occasioned under circumstances most favorable to the insurance company? Was the loss contributed to by Mrs. Reich or her company?"

Mr. Trager: "No question that it was."

However, such a showing would not be sufficient to relieve Great Northern from liability pursuant to the employee infidelity exclusion.

"Where a policy expressly insures against direct loss and damage by one element but excludes loss or damage caused by another element, the coverage extends to the loss even though the excluded element is a contributory cause." *Essex House v. St. Paul Fire & Marine Insurance Co.*, 404 F.Supp. 978, 985 (S.D.Ohio 1975); *see General American Transportation Corp. v. Sun Insurance Office, Ltd.*, 369 F.2d 906, 908 (6th Cir.1966); *Kraemer Bros., Inc. v. United States Fire Insurance Co.*, 89 Wis.2d 555, 570, 578, 278 N.W.2d 857, 863–64 (1979); 18 *Couch on Insurance Second* § 74:721 at 1026; *see also Tonkin v. California Insurance Co.*, 294 N.Y. 326, 329, 62 N.E.2d 215, 217 (1945) (holding that a fire insurance policy which excluded coverage due to collision only excluded a loss in which collision was "the primary and exclusive cause").

The rationale underlying this rule of construction is that an insurance company can draft its policy as it desires; "if the insurer desires to have more remote causes determine the scope of the exclusion, he may draft language to effectuate that desire." *Pan American*, 505 F.2d at 1007. The rule is particularly applicable to all risks policies where the insured specifically purchases comprehensive coverage.

> [W]hen a person buys an 'all risk' policy, he or she is purchasing a special type of coverage which is intended to protect even against damage partially caused by an excluded risk and partially caused by an included risk. This is evidenced by the fact that the person buying an 'all-risk' policy is paying more for precisely that type of comprehensiveness. *Benke v. Mukwonago-Vernon Mutual Insurance Co.*, 110 Wis.2d 356, 329 N.W.2d 243, 246 (1982).

Court: "All right. So these people were at most, Curry and Gordon, were at most contributory factors."

The employee infidelity provision in Great Northern's insurance policy merely states that it excludes losses "caused by or resulting from" an employee's dishonest act. If Great Northern had intended to exclude a loss where an employee's dishonest act was only a contributing factor, it could have drafted the exclusion to cover this situation. *Cf., Molycorp Inc. v. Aetna Casualty and Surety Co.*, 78 A.D.2d 510, 431 N.Y.S.2d 824 (1st Dept.1980) (construing a policy where the exclusionary clause expressly stated that a loss "caused by, resulted from, *contributed* to or *aggravated* by" surface water was excluded). The employee infidelity exclusion should thus be confined to its narrow terms.

Great Northern has failed to sustain its burden of proving that Dayco's loss was proximately caused by the dishonest acts of Dayco's employees. The infidelity of Dayco's employees played no part in Dayco's deception or its loss of goods. Accordingly, the employee infidelity exclusion does not relieve Great Northern from liability under the policy.

### III. Employment of Reasonable Means to Protect Property From Further Damage

Paragraph 12(a) of the insurance policy, entitled Protection of Property, states that "The insured's primary duty is to act in every respect as if no insurance existed. The Insured shall employ every reasonable means to protect the property from further damage, including the prompt execution of temporary repairs where necessary for such protection and separate damaged from undamaged personal property."

Great Northern contends that in accordance with this clause, once Dayco discovered the fraud, it had a duty to attempt to get back the goods and that Dayco failed to satisfy this duty. Thus, Great Northern argues that the loss is excluded by this clause.

Mr. Trager: "I would say yes, your Honor."

Great Northern's argument that the Protection of Property clause excludes Dayco's loss is unpersuasive. To prove that the claimed loss is excluded, Great Northern must demonstrate that its interpretation of the clause is the only reasonable reading of it. *See Pan American,* 505 F.2d at 999–1000. Pursuant to this rule of construction, it is questionable whether the clause can be interpreted to impose an affirmative duty on the insured to secure the return of property which is no longer in its control.

■ Nevertheless, even if the clause can be interpreted to place such a duty on the insured, Dayco has clearly satisfied its burden under the clause. Dayco retained John Huhs to investigate the existence or nonexistence of the contracts purportedly procured by Reich and to ascertain what had happened to Dayco's goods after shipment. Mr. Huhs met with representatives of Tractoroexport in Moscow on two occasions and made inquiries to determine what had happened to Dayco's goods after they were shipped to Russia. The Tractoroexport representatives stated that they no longer had Dayco's merchandise and that they had no knowledge as to the whereabouts of the goods. Dayco's inquiries were sufficient to satisfy any duty which it may have had to attempt to secure the return of its property.

Great Northern has failed to carry its burden of proof to establish that it is relieved from liability under the insurance policy by any exclusion contained therein. Accordingly, as to the declaratory judgment phase of this action, Dayco is entitled to a decree from this Court that Great Northern is obligated to indemnify Dayco for the loss of its goods, under the insurance policy. In addition, Dayco is entitled to an award of attorneys' fees for its defense of this declaratory judgment action. *See Johnson v. General Mutual Insurance Co.,* 24 N.Y.2d 42, 246 N.E.2d 713, 714, 298 N.Y.S.2d 937, 939 (1969); *Government Employees Insurance Co. v. DiCrisci,* 70 A.D.2d 628, 416 N.Y.S.2d 639, 640 (2d Dept.1979). An application for the reasonable counsel fees and costs expended in defense of this action should be submitted to the Court on notice, within 20 days from the date hereof.

*IV. Damages*

Dayco is also entitled to damages pursuant to its Counterclaim.

Paragraph 5 of the insurance policy, entitled "Valuation of Property", provides "for the purpose of this insurance, property will be valued at the full cost to repair or replace the property (without deduction for depreciation) if the property is actually repaired or replaced by the insured within a reasonable period of time following loss. The payment shall not exceed the amount actually spent to repair or replace the property for the same occupancy or use. If not repaired or replaced, the property will be valued at its actual cash value on date of loss."

New York courts have adopted a broad evidence test to determine the actual cash value of property; it is generally held that the court may examine any factor which is relevant to estimating the loss. *See Incardona v. Home Indemnity Co.,* 60 A.D.2d 749, 400 N.Y.S.2d 944, 945 (4th Dept.1977); *Gervant v. New England Fire Insurance Co.,* 306 N.Y. 393, 118 N.E.2d 574, 122 N.Y.S.2d 274 (1954); *Sebring v. Firemen's Insurance Co.,* 227 App.Div. 103, 237 N.Y.S. 120 (1929); *McAnarney v. Newark Fire Insurance Co.,* 247 N.Y. 176, 159 N.E. 902 (1928); 31 N.Y.Jur. § 1386 at 222–23. The court may consider the original cost, cost of repair, replacement value, fair market value, testimony of witnesses as to their opinion of value, and any other relevant evidence. *See Lucenti v. Cayuga Apartments, Inc.,* 66 A.D.2d 928, 410 N.Y.S.2d 928, 929–30 (3d Dept.1978); *Incardona,* 400 N.Y.S.2d at 945; *McAnarney* 247 N.Y. 176, 159 N.E. 902.

■ Dayco presented evidence of the standard manufacturing costs and the gross profit margins for the belts shipped to Russia. Ronald Powers, Dayco's Director of Manufacturing Accounting, testified as to the manner in which the standard

cost was determined and the regularity of the procedure. He also stated that the gross profit margins for the V-belts were similar to gross profit margins made by Dayco on the sales of similar belts in international markets, including Russia. In addition, Mr. Powers testified that the gross profit margins for the SPC belts were actually lower than the gross profit margins made, during the same time period, on the sale of the domestic equivalent of these belts. On the basis of his evaluation of the costs and profit margins for the belts shipped to Russia, Mr. Powers concluded that the unit sales prices contained in the fictitious contracts were reasonable.

This testimony was credible evidence of the actual cash value of the goods and the economic loss sustained by Dayco. The testimony was not credibly contradicted, nor disputed by any contrary evidence, except as to the value of two of the belts.[26]

Evidence was presented to demonstrate that the 4350 V-belt, which was listed on the fictitious contracts as having a sales price of $10.57, was sold by some of Dayco's European competitors at a price $3.00 to $4.00 below Dayco's standard cost. This evidence indicates that the actual cash value of the 4350 is approximately $3.00 to $4.00 less than the standard manufacturing cost presented by Dayco.

In addition, there was evidence to show that in 1984, Dayco sold the 3585 V-belt to the Russians for $3.75. This same belt was listed on the fictitious contracts at a sales price of $16.10. The disparity was not explained by Dayco. The actual price that Dayco charged on its sale in 1984 thus appears to be the appropriate measure of the actual cash value of the 3585 belt.

In a telex written after the discovery of Reich's fraud, Dayco authorized Tractoroexport to remit payment to Reich and FTC directly for certain goods which were delivered to Russia and thus gave up its right to recover for these goods. The evidence showed that during the Dayco delegation's meeting with Tractoroexport in January 1982, Tractoroexport informed the delegation that 95,040 pieces of the 4000 mm V-belt, which it had not ordered, were delivered to it, and that after considerable effort to sell the belts, it had recently authorized payment for them. On January 28, 1982, Dayco wrote a letter to Tractoroexport requesting that payment for the belts be remitted to Dayco's account. On February 19, 1983, Dayco sent Tractoroexport a telex requesting that payment not be remitted until Dayco had settled its dispute with FTC. Finally, on March 22, 1982, Dayco sent Tractoroexport a telex which stated that the dispute between Dayco, FTC and Reich had been settled and that payment for the overdelivered belts should be made to FTC.

■ By releasing any claim which it had to payment for the 95,040 pieces of the 4000 mm belt, Dayco gave up its right to recover for these belts under the insurance policy. Consequently, Dayco cannot recover for 77,460 pieces of the 4000 mm belt sent in shipment 2 and 17,580 pieces of the 4000 mm belt sent in shipment 3.

On the basis of the above, the total actual cash value of the belts which Dayco lost is $9,672.428.39. After reducing this amount by $4.1 million, for the payments received by Dayco,[27] and for the $1 million limit for each loss, the amount of Dayco's total loss recoverable under the insurance policy is $3,759,523.20.[28]

*Newark Fire Insurance Co.,* 247 N.Y. at 181, 159 N.E. at 902.

---

**26.** Great Northern also argued that the belts shipped to Russia had no economic value because they were specially manufactured for the Russians and there was no market for them outside of the Soviet Union. Great Northern is, however, confusing market value with actual cash value. The fact that the goods are manufactured specially for a single market or that there is no market for them does not mean that the goods have no value. *See McAnarney v.*

**27.** The credit for the money received is applied to each shipment in the same manner done by Dayco in filing its claim with the insurance company.

**28.** See Addendum for breakdown of loss for each of the shipments.

Accordingly, judgment is awarded on Dayco's counterclaim against Great Northern for $3,759,523.20, plus interest, to be calculated on the respective claims allowed herein, from a date 60 days after proofs of loss thereon were filed, to which will be added the allowance of fees and disbursements to be fixed by the Court on the application to be submitted in connection with the dismissal of the declaratory judgment claim referred to above.

The foregoing shall constitute the findings of fact and conclusions of law required under Rule 52(a) of the Federal Rules of Civil Procedure.

An appropriate form of judgment conforming to Rule 54 of the Federal Rules of Civil Procedure should be submitted, on five days notice, within 30 days hereof, the interest as calculated to a date specified, to be accompanied by an explanatory memorandum and a figure stated for the daily accrual of interest after the specified date. A blank space should be left for inclusion of the amount of the allowances to be fixed by the Court in respect of the dismissal of the Declaratory Judgment claim as mentioned above.

So Ordered.

## ADDENDUM

### Actual Cash Value of Dayco's Loss

| Shipment Number | Belt Type | Quantity | Unit Sales Price | Total Sales Price |
|---|---|---|---|---|
| 1 | 4000 mm | 36,660 | $38.00 | $1,393,080.00 |
| | 4350 mm | 119,056 | 5.80 | 690,524.80 |
| | 2650 | 67,000 | 8.25 | 552,750.00 |
| | | | Total | 2,636,354.80 |
| | | Credit for Money Received | | 2,370,421.00 |
| | | | Total Loss | 265,933.80 |
| 2 | 4000 mm | 77,460 | (Dayco is unable to recover for these belts) | |
| 3 | 2360 mm | 125,000 | $ 7.52 | $ 940,000.00 |
| | 4000 mm | 32,880 | 38.00 | 1,249,440.00 |
| | 4000 mm | 22,400 | 41.00 | 918,400.00 |
| | | | Total | 3,107,840.00 |
| | | Credit for Money Received | | 784,000.00 |
| | Deduction for 17,580 pieces of 4000 mm belt | | | 615,300.00 |
| | | | | 1,708,540.00 |
| | | Total Loss after $1 million limit | | 1,000,000.00 |
| 4 | NO CLAIM WAS MADE BY DAYCO | | | |
| 5 | SPC 2000 | 800 | $ 8.85 | $ 7,080.00 |
| | SPC 3150 | 4,000 | 14.92 | 59,680.00 |
| | SPC 3750 | 2,000 | 17.93 | 35,860.00 |
| | | | Total | 102,620.00 |
| | | Credit for Money Received | | 76,933.00 |
| | | | Total Loss | 25,687.00 |
| 6 | SPC 2000 | 3,200 | $ 8.85 | $ 28,320.00 |
| | SPC 3150 | 1,200 | 14.92 | 17,904.00 |
| | SPC 3550 | 2,400 | 16.96 | 40,704.00 |
| | SPC 3750 | 560 | 17.93 | 10,040.80 |
| | SPC 2000 | 2,400 | 8.85 | 21,240.00 |

| Shipment Number | Belt Type | Quantity | Unit Sales Price | Total Sales Price |
|---|---|---|---|---|
| | SPC 3150 | 2,500 | $14.92 | $ 37,300.00 |
| | SPC 3550 | 2,400 | 16.96 | 40,704.00 |
| | | | Total | 196,212.80 |
| | | Credit for Money Received | | 86,482.00 |
| | | | Total Loss | 109,730.80 |
| 7 | 4350 mm | 40,320 | $ 5.80 | $ 233,856.00 |
| | 3585 mm | 27,360 | 3.75 | 102,600.00 |
| | 2650 mm | 44,076 | 8.79 | 387,428.04 |
| | 2360 mm | 58,091 | 8.05 | 467,632.55 |
| | 3670 mm | 17,730 | 47.50 | 842,175.00 |
| | 3475 mm | 17,424 | 24.55 | 427,759.20 |
| | 2600 mm | 15,848 | 25.80 | 408,878.40 |
| | | | Total | 2,870,329.19 |
| | | Credit for Money Received | | 533,586.00 |
| | | | | 2,336,743.19 |
| | | Loss After $1 million Limit | | 1,000,000.00 |
| 8 | SPC 3550 | 4,800 | $16.96 | $ 81,408.00 |
| | SPC 3150 | 1,000 | 14.92 | 14,920.00 |
| | | | Total | 96,328.00 |
| 9 | SPC 2000 | 4,800 | $ 8.85 | $ 42,480.00 |
| | SPC 3150 | 3,500 | 14.92 | 52,220.00 |
| | SPC 3750 | 400 | 17.93 | 7,172.00 |
| | | | Total | 101,872.00 |
| | | Credit for Money Received | | 16,200.00 |
| | | | Total Loss | 85,672.00 |
| 10 | SPC 2000 | 640 | $ 8.85 | $ 5,664.00 |
| | SPC 2800 | 240 | 12.96 | 3,110.40 |
| | SPC 3150 | 300 | 14.92 | 4,476.00 |
| | SPC 3550 | 360 | 16.96 | 6,105.60 |
| | SPC 3750 | 1,400 | 17.93 | 25,102.00 |
| | | | Total | 44,458.00 |
| 11 | 4350 mm | 32,640 | $ 5.80 | $ 189,312.00 |
| | 3585 mm | 22,640 | 3.75 | 84,900.00 |
| | 3475 mm | 15,552 | 24.55 | 381,801.60 |
| | 3585 mm | 8,800 | 3.75 | 33,000.00 |
| | | | Total | 689,013.60 |
| 12 | SPC 2000 | 7,760 | $ 8.85 | $ 68,676.00 |
| | SPC 2800 | 60 | 12.96 | 777.60 |
| | | | Total | 69,453.60 |
| 13 | 4350 mm | 7,984 | $ 5.80 | $ 46,307.20 |
| | 3475 mm | 7,024 | 24.55 | 172,439.20 |
| | 3585 mm | 41,200 | 3.75 | 154,500.00 |
| | | | Total | 373,246.40 |
| Total Amount of Dayco's Loss | | | | $3,759,523.20 |

## AMENDED AND SUPPLEMENTAL FINDINGS

In an opinion dated June 12, 1986, this Court awarded judgment to Dayco Corporation ("Dayco") on its counterclaim against Great Northern Insurance Co. ("Great Northern") for $3,759,523.21, plus interest.

## I. Modification of Damage Award

Dayco submitted a post-trial brief requesting a modification of the damages awarded.

### 4350 belt

The Court found that the actual cash value of the 4350 belt was approximately $3 to $4 less than Dayco's standard manufacturing cost based on the fact that European competitors had sold the belt at these lower prices.

Dayco contends that there was no credible or admissible evidence showing that the belt was sold below its unit sales price of $10.57. Dayco asserts that the only evidence introduced at trial that competitors had sold the belt at lower prices was a statement by Edith Reich which was not credible. Further, Dayco contends that there was no evidence which showed that the belts sold by the competitors were comparable to the 4350 belt.

Great Northern argues that the Court's judgment as to the 4350 belt was proper since an internal Dayco memorandum stated that European competitors were selling the belt for $3 to $4 less than Dayco's cost and Dayco's Director of Accounting admitted that some of the 4350 belts which Dayco shipped to Russia were actually purchased from European competitors for less than Dayco's cost.

### Evaluation

Great Northern introduced Plaintiff's Exhibit 52 in evidence as proof of the actual cash value of the 4350 belt. The Exhibit is an internal Dayco memorandum, dated February 8, 1980, discussing the production of the 4350 belt. The memorandum states that Dayco is not capable of producing the quantity of belts ordered, and that it will have to purchase 120,000 pieces of the belt from competitors to meet the contract requirements. The memo refers to a statement made by Edith Reich that certain European manufacturers were selling the belt for approximately $5 or $6. No other testimony was introduced to show that the competitors actually sold the 4350 belt at such prices.

It is questionable whether the statement attributed to Reich in the memo is credible evidence, given Reich's fraud. Moreover, it seems that the statement is hearsay and, as such, is inadmissible as evidence. Thus, there was no reliable proof that European manufacturers sold the 4350 belt for $3 to $4 less than Dayco's standard manufacturing cost.

However, there was credible evidence introduced which proved that the 4350 belt had an actual cash value lower than Dayco's unit sales price. Ronald Powers, Dayco's Director of manufacturing accounting, testified that Dayco bought approximately half of the 4350 belts which it shipped to Russia from Eupropean competitors at a price which was approximately $2 lower than Dayco's standard manufacturing cost. *See Transcript* at 575–76 (Powers recalled that Dayco purchased one belt—which he believed was the 4350 belt—from some European manufacturer at a price which was cheaper than they could manufacture the belt; Powers stated that the belt was purchased from the competitor for approximately $2 less than Dayco's cost); *Transcript* at 579 (Powers stated that the 4350 belt was manufactured by a competitor, Optibelt, and sold for less than Dayco's cost); *Transcript* at 583 (Powers stated that he was aware of one manufacturer who could sell one of the belts cheaper than Dayco could manufacture it); *Transcript* at 587 (Powers stated that Dayco bought the 4350 belt from a competitor for a price less than Dayco standard cost and that approximately 50% of the belts shipped to Russia were bought from competitors).

This evidence is credible proof that the 4350 belt[1] was sold by competitors for $2

1. Since the belts which Dayco bought from the European competitor were shipped to Russia to fulfill the Russian orders, it is clear that these

less than Dayco's cost.[2] On the basis of the above, the actual cash value for the 4350 belt is $7.18. Accordingly, there should be an increase in the award to Dayco of $220,358.40.[3]

*3585 belt*

The Court found that the actual cash value of the 3585 belt was $3.75 based on Dayco's sale of the belt to the Russians in 1984 for that price.

Dayco contends that it was improper for the Court to consider the 1984 sale as evidence of the actual cash value of the 3585 belt because the sale was not at the time of the loss and further, because the 1984 sale was a "fire sale".

Great Northern contends that no evidence was offered to demonstrate that the 1984 sale was a "fire sale."

At trial, Dayco claimed that the 3585 belt had an actual cash value equal to its unit sales price of $16.10. However, Great Northern presented evidence at trial which showed that Dayco had sold the 3585 belt, for $3.75 in 1984. *Transcript* at 590–91.

The insurance policy required that the property be valued at its actual cash value at the time of the loss. Although the 1984 sale did not occur at the time of the loss, it is still evidence of the value of the belt at the time of the loss. Without an explanation of the price disparity, it is difficult to believe that the value of the 3585 belt dropped by more than $8 in three years. Dayco failed to submit any evidence at trial to explain the disparity in price. *See Tran-*

*script* at 591 (Powers was asked to explain the disparity and he could not). In fact, the first time that Dayco attempted to explain the low 1984 sales price was in its post-trial brief and even then Dayco offered no factual evidence to support its assertion that the 1984 was a "fire sale".

*95,040 pieces of the 4000 mm belt*

The Court found that Dayco could not recover for 95,040 pieces of the 4000 belt because it sent a telex to Tractoroexport stating that payment for these belts should be made to FTC.

Dayco contends that it had attempted to obtain payment for these belts prior to sending the telex, but was told by the Russians that payment could only be changed with the agreement of FTC. Dayco thus argues that since it had no rights of recovery against Tractoroexport, the telex had no substantive effect and could not be considered a release of its rights. Dayco contends that the telex was merely sent in an effort to settle its dispute with Reich.

The Court's opinion used the term "release" or "releasing" in explaining why Dayco was denied recovery for the 95,040 pieces of the 4000 mm belt. The use of this term may have been misleading. The basis on which Dayco is denied recovery for these goods is not that its actions had the legal effect of a release, but because Dayco did not prove that these goods were lost. By directing Tractoroexport to pay Reich for the 95,040 pieces of the 4000 belt, Dayco could no longer claim that these belts were stolen by Reich. Thus, Dayco

---

belts were the same or very similar to the 4350 belt.

**2.** Power's statements are supported by Exhibit 52—the internal Dayco memo—which states that Dayco could not produce all of the 4350

belts required and that it would have to buy some of the belts from competitors.

**3.** The increase in the award to Dayco is calculated as follows:

Shipment 1  119,056 × ($7.18 − $5.80)  = $164,297.28
Shipment 7 no change since it is in excess
  of the $1 million limit
Shipment 11  32,640 × ($7.18 − $5.80)  = $45,043.20
Shipment 13  7,984 × ($7.18 − $5.80)  = $11,017.92

Total Increase  $220,358.40

failed to sustain its burden of proof to recover for these belts under the policy.

*Deductible Clause*

The insurance policy at issue in this case provided for a $10,000 deductible for each loss claimed. The insurance policy states:

"*Deductible:* No claim shall be made under this policy unless loss or damage so caused exceeds the amount indicated below and then this company shall be liable for the amount of loss in excess of the amount indicated below not exceeding, however, the limit of this policy. $10,000 for Property Damage."

Pursuant to the policy deductible, Dayco's award should be reduced by $90,000.[4]

Accordingly, on the basis of the modifications stated above, Dayco's award is increased in the amount of $130,358.40.

## II. Attorneys' Fees

In its June 12, 1986 opinion, the Court stated that Dayco is entitled to an award of attorneys' fees for its defense of the declaratory judgment action.

Dayco has submitted an application for attorneys' fees incurred in defending the declaratory judgment action brought by Great Northern. Great Northern opposes this application. Relying on *Puritan Insurance Co. v. Eagle Steamship Co. S.A.,* 779 F.2d 866 (2d Cir.1985), Great Northern contends that fees are not recoverable in this case because there was no duty to defend.

*Evaluation*

*Puritan Insurance Co.* involved an action brought by an insurance company seeking damages and a declaration that a maritime insurance policy, covering the hull and machinery, was void. The district court dismissed the claim and awarded the insured attorneys' fees.

On appeal, the Second Circuit upheld the dismissal, but remanded the case for a reconsideration of the attorneys' fee award.

The Second Circuit had two difficulties with the award of fees. First, the Court stated that the district court should have considered whether federal admiralty, rather than state law, governed the availability of attorneys' fees. Second, the Court questioned whether New York law, if applicable, would permit the award of fees in a case where the insurer was under no obligation to defend since the New York cases which permitted the award of attorneys' fees seemed to be based on the breach of the insurer's responsibility to defend.

The Second Circuit did not actually decide the insurer's obligation for the attorneys' fees in the *Puritan* case; the issue was left for consideration by the district court. Thus, the Second Circuit's suggestion that New York law does not permit an award of attorneys' fees in a case where there is no duty to defend is not binding precedent.

The New York cases which permit an insured to recover its legal expenses for defending a declaratory judgment action brought by the insurer to declare non-coverage base the award of fees on the insurer's breach of its duty to defend.

The first case where legal costs were awarded is *Johnson v. General Mutual Insurance Co.,* 24 N.Y.2d 42, 298 N.Y.S.2d 937, 246 N.E.2d 713 (1969). In that case, the subrogee of the insured brought a declaratory judgment action against the insured and his insurance company to compel the insurer to defend. The insured cross-claimed against the insurer. The Court held that the insured was entitled to recover expenses for its defense of the action (although not for its prosecution of the cross claims) since the expense of defending the declaratory judgment action arose as a direct consequence of the insurer's breach of its duty to defend.

Later cases extended the holding in *Johnson* to the situation where the insurer

---

**4.** The policy deductible does not affect the award for shipments 3 and 7 since the total loss sustained on these shipments exceeded the policy limit.

brought a declaratory judgment action against the insured. *See, e.g., Glens Falls Insurance Co. v. United States Fire Insurance Co.*, 41 A.D.2d 869, 342 N.Y.S.2d 624, 627 (3d Dept.1973). The language in some of these cases could be seen as sufficiently broad to permit the award of fees whenever an insured is cast in a defensive position by the insurer, regardless of whether there is a duty to defend. *See e.g., Mighty Midgets, Inc. v. Centennial Insurance Co.*, 47 N.Y.2d 12, 416 N.Y.S.2d 559, 389 N.E.2d 1080 (1979) (stating that an award of fees is available when the insured is "cast in a defensive posture by the legal steps an insurer takes in an effort to free itself from its policy obligations"). However, upon closer examination, it appears that the availability of fees is dependent on a breach of the insurer's duty to defend. *See Glens Falls Insurance Co. v. United States Fire Insurance Co.*, 41 A.D.2d at 870, 342 N.Y.S.2d at 627 ("An insured is entitled to recover the expenses of defending a declaratory judgment brought as a result of an insurer's breach of its obligation to defend).

The cases permitting an award of fees involved insurance contracts that obligate the insurer to defend, as well as to indemnify the insured against loss. Moreover, the basis on which fees were awarded is that legal expenses incurred in defending the declaratory judgment action are directly attributable to and a consequential damage of the insurer's breach of its duty to defend. *See Allstate Insurance Co. v. Aetna Casualty & Surety Co.*, 123 Misc.2d 932, 475 N.Y.S.2d 219 (1984); *Brown v. United States Fidelity & Guaranty Co.*, 46 A.D.2d 97, 361 N.Y.S.2d 232 (3d Dept. 1974). "Essentially, these cases find support in the theory that an insurer's responsibility to defend reaches the defense of any actions arising out of the occurrence."

*Mighty Midgets*, 416 N.Y.S.2d at 564, 389 N.E.2d at 1085.

■ In cases where the insurer denied coverage, but did not breach its duty to defend, the courts refused to award attorneys' fees. In *Sukup v. State*, 19 N.Y.2d 519, 281 N.Y.S.2d 28, 227 N.E.2d 842 (1967), the court held that the insurer was not liable for the legal expenses incurred by the insured in a worker's compensation hearing in which the question of coverage was litigated. The court denied fees because the insurer had not refused to defend the insured, but had merely suggested that the insured participate in the hearing since questions of substantive coverage were involved. Likewise, in *American Motorists Insurance Co. v. E.R. Squibb & Sons, Inc.*, 95 Misc.2d 222, 406 N.Y.S.2d 658 (1978), the court held that the insured could not recover fees incurred in defending a declaratory judgment action where the insurer defended the insured in the main action, with a reservation of rights. Thus, in New York, the right to recover attorneys' fees incurred in defending a declaratory judgment action brought by the insurer is limited to situations where the insurer breached its duty to defend. Accordingly, Dayco's application for attorneys' fees is denied.

SO ORDERED.